# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
Assigned on Briefs December 6, 2013

## IN RE: JOCILYN M.P.

**Appeal from the Chancery Court for Knox County**
**No. 183595-3     Michael W. Moyers, Chancellor**

---

**No. E2013-01933-COA-R3-PT-FILED-JANUARY 24, 2014**

---

In August of 2012, Chloe S.K. ("Mother") and Timothy A.K. ("Step-father") filed a petition seeking to terminate the parental rights of Joshua A.P. ("Father") to the minor child Jocilyn M.P. ("the Child") and to allow Step-father to adopt the Child. After a trial, the Trial Court entered its Final Order Terminating Parental Rights on August 19, 2013 terminating Father's parental rights to the Child after finding and holding, *inter alia*, that clear and convincing evidence existed of grounds to terminate Father's parental rights to the Child pursuant to Tenn. Code Ann. § 36-1-113(g)(1) and Tenn. Code Ann. § 36-1-102 (1)(A)(iv) for both willful failure to support and for wanton disregard, and that clear and convincing evidence was proven that it was in the Child's best interest for Father's parental rights to be terminated. Father appeals the termination of his parental rights. We affirm the termination of Father's parental rights to the Child.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed Case Remanded**

D. MICHAEL SWINEY, J., delivered the opinion of the Court, in which JOHN W. MCCLARTY, and THOMAS R. FRIERSON, II, JJ., joined.

Joshua Hedrick, Knoxville, Tennessee, for the appellant, Joshua A.P.

Dawn Coppock, Strawberry Plains, Tennessee, for the appellees, Chloe S.K. and Timothy A.K.

Charlotte K. Tatum, Knoxville, Tennessee, Guardian Ad Litem for Jocilyn M.P.

# OPINION

## Background

Mother and Step-father filed the petition seeking to terminate Father's parental rights to the Child on August 23, 2012 so that Step-father could adopt the Child. Father was incarcerated at that time. The case proceeded to trial in July of 2013, and Father, still incarcerated, testified at trial via telephone.

The parties entered into a number of written stipulations ("the Stipulations"). Specifically, as relevant to this appeal, the parties stipulated that the statutorily relevant time period in this case was March 14, 2011 through July 14, 2011 ("Relevant Time Period"). Additionally, the stipulations include a summary of Father's criminal history, details about Father's visits to Westbrook Medical Center where he was prescribed at least two opiates per visit for 33 visits from December of 2008 through June of 2011, details about orders of protection against Father obtained by both Father's ex-wife and Mother, details about Father's employment with Harrison Construction and Professional Landscape, details about unemployment records for Father including records which show that Father had been overpaid unemployment benefits in excess of $1,000 during the Relevant Time Period, details about Father's discharge from Westbrook Medical Center for testing positive for drugs not prescribed, details about Father's payments to Rigg's Pharmacy of over $1,100 for prescription pain medication during the Relevant Time Period, Father's admission in his answers to interrogatories that he abused pain medications "as frequently as I could get them until the day I got arrested," and Father's admission that he paid no child support for the Child after Mother moved out of his house in May of 2010.

Father married another woman in August of 2003, and two children were born of this marriage. Father and Mother began dating in February of 2008, and Mother moved in with Father and his two children in late March or early April of 2008. Mother became pregnant with the Child in August of 2008. Father and his wife were divorced in November of 2008. Mother gave birth to the Child in March of 2009. Father's ex-wife died in May of 2012.

At trial, Father, who was 33 years old, testified that he was incarcerated at South Central Correctional Facility. He expected to be released in September of 2013. Father testified that his other two children were living with his mother. The Child was four years old at the time of trial. Father admitted that he had been in jail for almost half of the Child's life. He also admitted that Mother is "a good parent."

Father admitted that he first began using drugs and engaging in criminal behavior before he became an adult. Father admitted that he has an extensive criminal history most of which involved theft or charges involving drugs or alcohol. He also admitted that he has been in jail a number of times.

Father was asked why he stole and he stated: "Well, at the time . . . I don't know. I mean. I won't lie. I mean, at that time when I did feel I had a problem with drugs." Father agreed, however, that in 2008, when he began picking up theft charges again after a period of having no charges, he did not have a serious drug problem. Father stated: "That was just one charge. And it's because I just bought my house. I got laid off from my job. And I was only in the house for a few months before I was about to lose it." Father testified that he was going to steal scrap metal. Father also admitted that he had been charged with burglary for stealing two flat screen TVs from his half-brother's house.

Father testified that he has been caught every time he has stolen. When asked why he continued to steal if he gets caught every time, Father stated: "Well, I mean, to make money." Father was asked how he makes money from stealing if he gets caught every time, and he admitted that he has not been caught every time he stole. Father testified that he had no income from theft during the Relevant Time Period. He stated that he had a job at that time working for Harrison Construction.

Father admitted that he and his girlfriend, Hailey Hensley, were co-defendants in a theft. He further admitted that Ms. Hensley has a drug problem, but Father stated: "And I'm no longer with her." Father admitted that he had seen Ms. Hensley inject drugs. Father's prison records reflect that he told prison officials that Ms. Hensley had Hepatitis C. Father denied making this statement. Father testified that he was tested and that he tested negative for Hepatitis C. Father admitted that he has Ms. Hensley's name tattooed on his arm, and that Ms. Hensley has his name tattooed on her body "right below her stomach."

Father's mother obtained an order to prevent Ms. Hensley from being around Father's other two children. Father stated that his mother obtained the order "[b]ecause Hailey acted like a fool at my wife's funeral in front of my children."

Father admitted that he asked Ms. Hensley to leave his house for hitting Father's son. Father explained: "She whipped him, and I made her leave. Yes." Father admitted that he had left his children alone with Ms. Hensley. Father further admitted that after he made Ms. Hensley move out for whipping his son, he subsequently allowed Ms. Hensley to move back in with him and his children.

Father was asked if he and Ms. Hensley still were involved in a relationship, and he stated: "No, we're not. The last time I heard, she was with a guy named Tim-something." Father was asked if he knew why Ms. Hensley was telling people that they still were involved, and he stated:

> She's done nothing but gotten me in trouble. She set me up a FaceBook account when I was incarcerated, and I did not know it. And that got me strip-searched in my cell, because they thought I had a cellphone on me.
>
> So, I mean, I can't help what Hailey does out there.

Father testified that he also had a relationship with Brittany Murray. Father admitted that Ms. Murray has a criminal record and uses a number of recreational drugs. Father was asked why he testified at trial that his girlfriends included Ms. Hensley and Ms. Murray, but failed to disclose Ms. Murray in his answers to interrogatories. He was asked if his failure to disclose was because he was trying to hide Ms. Murray's criminal record and drug use, and he stated:

> See, I never knew that she shot up drugs. And I never knew she had a criminal history. I thought the only charge she ever had was, you know, after me and her had separated, because she was incarcerated then. . . . Because she wasn't a very big part of my life. I was with her for just a couple of months.

Father admitted that Ms. Murray did live with him for several months "[o]ff and on at my house."

Father admitted that his ex-wife obtained an order of protection against him. Father testified that he agreed to entry of this order of protection, and also testified that he agreed to entry of an order of protection that Mother obtained against him.

The parties stipulated that Father knows a number of people with felony convictions. Father admitted that Ms. Hensley's father, Rick Hensley, has a significant criminal record. Father also admitted that the brother from whom he stole the TVs has a felony conviction and has visited in Father's house. Father admitted that he is friends with a man known as "Corn Dog" who is in prison serving time for murder, and that Father talked with this man during the year or two prior to Father's current incarceration.

Father admitted that from the period of 2010 through the present he was not supposed to own a handgun, and stated that he did not own a handgun. Father admitted that he has a tattoo on his chest of "SAC," which stands for Southerland Avenue Crips.

-4-

Father admitted that his job skills are running heavy equipment. He testified that he did this type of work for ten years before he was incarcerated and was paid $14 per hour. Father stated: "I've always held a job from the time I turned 16, until now. Or until I got incarcerated." Father testified that just prior to his current incarceration he "had just lost a job at Brightside Landscaping." Father admitted receiving unemployment, but denied the benefits being cut off because he had intentionally and fraudulently failed to report that he was working for Professional Landscape Management during the period of April 23, 2011 through May 14, 2011. Father denied ever receiving a letter regarding overpayment of unemployment benefits.

Father admitted that he knows that he has an obligation to support his children. He testified that he began the process and obtained a child support order for the Child in March of 2011. Father stated that the order required him to pay child support of $260 per month for the Child. Father testified that he never paid this child support. Father stated that he could not pay because he had "been laid off," but then admitted that he had reported that he was working at a landscaping company. Father then stated: "Well, making eight-fifty ($8.50) an hour. And driving way to West Knoxville. I spent more on gas than I was putting in my own pocket." Father admitted that he was able-bodied and "was able to work," and further admitted that the work he did for the landscaping company was heavy physical work.

Father admitted that he went to Westbrook Medical Clinic at least once a month for 33 months and received prescriptions for narcotic medicine. He admitted that in order to obtain these prescriptions he told the people at the clinic that he had a variety of serious physical problems. Father stated that he reported pain in his lower back and his left knee. Father's prison records reflect that he told prison officials that the pain was in his right knee. Father admitted that he never missed a visit to the pain clinic in 33 months.

Father admitted that he spent over one thousand dollars on medication at Rigg's Pharmacy during the Relevant Time Period. Father stated that insurance paid for his medications, and that he paid only about one hundred dollars a month out-of-pocket. When asked why the records from Rigg's Pharmacy show that he paid over one thousand dollars out-of-pocket and not through insurance, Father stated: "That cannot be true. Because altogether, I think my - - what I put out-of-pocket each month was right around one hundred and thirty dollars ($130), I guess." Father admitted that all of the prescriptions that he obtained from Rigg's Pharmacy during the Relevant Time Period were for opiates. Father admitted that he was taking opiates every day. He also admitted that he drove a car while he was taking opiates, and that he drove while on opiates with his children and his girlfriend's children in the car.

-5-

Father admitted that despite telling prison officials that he had a serious drug problem, he checked the boxes on the prison forms stating that his drug problem was "Not at all" serious and that it was "Not at all" important for him to receive drug treatment. Father stated that he volunteered to take Phase I, Phase II, and Phase III drug treatment in prison.

Father testified that he had told his mother in the past that he would quit drugs and stated: "I've quit before. . . . Well, I quit once before. And about twice - - I've quit twice." Father was asked when he had quit, and he stated:

> I didn't use drugs back in the early 2000's. . . . Back in the 2000's, I didn't have a drug problem. I mean, yes, I had a simple possession. And that was over weed paraphernalia, is what that was.

> And right before I got locked up, I did quit taking pain medication because my mother and my ex-wife both stayed with me and, you know, helped me get clean.

Father admitted that he began using drugs again. At trial, Father denied using drugs the day he became incarcerated, but admitted that he "could have said" in his answers to interrogatories that the last time he used drugs was the day he was arrested. When asked if it had been two or three years since he had been clean outside of prison Father stated:

> Yes, I've been clean. I was only addicted to pills maybe for a year, I guess. . . . You really don't know you have a problem until, you know, you don't have any medication. You know, that's when you find out, when you don't have it. That's when you get sick. That's when you find out.

Father's oldest child was eight at the time of trial. Father admitted that he had eight years to get clean for his oldest child and had not done so. When asked why he thought this time was different, Father stated:

> Well, I mean, I didn't know I had a problem until the last year of me being - - going to the pain clinic.

> Like I said, you don't know you have a problem until you're right there. I mean - - . . . . I mean, I made a mistake. I went to a pain clinic. I wish I had never done that. But that's nothing I can take back. I went to a pain clinic back in '98, and I got out of it. You know, it just - - and I didn't have kids then. . . . Everybody makes mistakes. Mine are just worse than others.

Father stated: "Before I got incarcerated this time right here, yes, I got clean for a week. And then, yes, I did get back on, you know, prescription pills again. Yes."

Father was asked why he believes his failure to visit the Child was not willful, and he stated:

> Because [Mother] tried to keep my daughter away from me. That's why I took her to court to get my visitation rights.
>
> I'm the one that started the, you know, the child support. I know I didn't pay child support, and I know that will be your next thing. So, no, I did not pay child support. All right.

Father testified that he never missed any of his court ordered visitations with the Child.

The Stipulations show that in August of 2011, shortly after the Relevant Time Period, Father attempted to shoplift 14 cases of baby formula worth over $1,000 from a Food City on Maynardville Highway. Six days later Father did the same thing at a Kroger on Clinton Highway, and two days after that he again attempted the same crime at the same Kroger. In August of 2011 the Child, who is Father's youngest child, was approximately two and a half years old. With regard to these charges Father stated: "Some of those got dropped. So I don't even - - I don't know." Father admitted, however, that whether the charges were dropped or consolidated he got caught four times within eight days attempting the same crime, three times in the same store. When asked if he had been thinking clearly, Father stated: "I don't guess so." It was around this same time period that Father broke into his half-brother's house to steal the TVs.

Father admitted that he lived with Mother and the Child for approximately 14 months and that Step-father has lived with Mother and the Child since Step-father and Mother were married approximately 16 months prior to trial. Father admitted that he had heard that the Child didn't even remember him. Father stated:

> When [Mother] got with me, I had two kids. I have two kids. And she loved them to death until [the Child] come along. And then her love for [the Child] was different from my other two kids. And she knows that.
>
> And the same goes for me and that guy, [Step-father]. He might love my daughter, but he does not love her like I do. Because that's my daughter.

-7-

Father obtained his GED in February of 2013 while he was incarcerated. Father testified that he also had taken parenting classes and Phase I and Phase II anger management classes during his incarceration. Father testified that he has completed Phase I and Phase II drug abuse prevention classes and is taking Phase III, which he expects to complete before his release date. Father testified that his Phase I prison counselor reported that Father was always on time and present for the classes and had done his homework. Father also voluntarily attended A.A. and N.A. meetings in prison. Father testified that he has not incurred any disciplinary actions during his incarceration. Father testified that he intends to live with his mother and his two older children when he is released.

Father testified that during the Relevant Time Period he was in the process of losing his house, was not making house payments, and was staying with his mother. When asked if he paid his mother to live with her, Father stated: "I mean, if I had something, I mean, I would help. You know, maybe ten dollars ($10), I guess, or fifteen ($15) - - you know."

Mother testified that the Child was four years old at the time of trial and lived with Mother and Step-father. Mother's household also includes Step-father's two children from a previous relationship who stay with them about half the time, and a child Mother and Step-father had together. Mother testified that Step-father wants to adopt the Child if Father's paternal rights are terminated. Step-father testified that he wants to adopt the Child, and that he considers the Child "one of my kids."

Mother testified that she moved in with Father at the end of March of 2008 and became pregnant with the Child in August of 2008. Mother testified that after the Child was born, Father's brother and Timmy Weaver moved in with Father and Mother. Both Father's brother and Mr. Weaver have criminal histories and were using drugs. Mother moved out of Father's house in May of 2010. The Child was approximately one year old when Mother moved out of Father's house.

Mother described an incident that occurred in April of 2010 when Father's brother and Mr. Weaver decided to rob a drug dealer and Father "went and got a pistol and gave it to [Mother] to use when he was going to go rob the drug dealer." Mother testified that Father allowed his brother and Mr. Weaver to come back to Father's house after they robbed the drug dealer, and Mother stated that there were bullet holes in the side of Father's brother's truck. Mother and Father's three children were all at home at that time. Mother stated that she attempted to stop the men from committing the crime. She stated:

But I said, "Well, this is not right. You don't need to do this. Those are your kids. You're willingly and knowingly putting them in harm's way. You're putting their life in somebody else's hands."

And I was holding [the Child]. And just like this rage came over him. And he pushed me twice, and told me that I needed to mind my own fucking business. And that I should be lucky that he didn't beat me like he had beat his exes.

Mother described another incident that occurred after the robbery of the drug dealer stating:

After the incident with the gun and the robbery and his brother robbing the drug dealer, for days I was like, I can't - - why would you do that to your kids? Why would you put us in harm's way?

And he told me - - we were in our bedroom - - and the same pistol that he had given his brother, he handed it to me.[1]

And he said, "Well, if you're that unhappy and you don't like the way we're doing, then you just need to kill yourself. That's what you need to do. You just need to just kill yourself."

(footnote added). Mother testified that Father threatened her "constantly. It was almost a daily occurrence." She stated that he threatened to kidnap the Child if Mother ever left him and prevent Mother from ever seeing her. Mother also witnessed Father threatening other people   including his ex-wife and his mother's boyfriend.

Mother described Father's treatment of his two older children stating:

He would get very easily aggravated with [his son].

And he would forcibly spank him, past the point of, you're in trouble, you've done something wrong, you need to be disciplined. Just, he would lose his - - he would lose his temper. He would go off. He would scream and cuss. [His son] should - - he should know better. That was all the time.

He was easily agitated all the time. Everything drove him crazy. Especially when - - and it worsened after [Father's older daughter], the middle daughter, when she turned two and started potty training.

---

[1]Mother earlier had testified that Father gave the gun to her. Whether Father gave the gun to Mother or to his brother, Mother's testimony shows that Father possessed a gun he was not supposed to have.

Of course, you know, it is stressful. But, you know, when she would have an accident, which they're going to have accidents, that was huge. He would blow up. You know, he would bust her butt, and bust her bare bottom. You know, I mean, he would pull her pants down and bust her bare bottom.

And just, he would go off. "You know better. You know better. You don't pee on yourself."

I mean, there was even an occasion or two where he made her clean up her own mess. And I would come back and baby her, like, "It's okay - - it's okay."

But then I caught hell. Because why would I . . . I'm not supposed to question what he does. Basically, I didn't have a say. My voice wasn't important.

Mother testified that Father was not visiting the pain clinic when they first met. Mother stated that later: "he was using constantly. I mean, there was always pain pills in the house. And then there were his friends with pain pills in the house. And everybody was always high but me. . . . I was taking care of everybody. I cooked for everybody; breakfast, lunch, dinner. I did everybody's laundry, even though that was a chore."

Mother described her interaction with Father during the Relevant Time Period stating:

He would call very, very late at night, clearly, completely out of reality - - high. "We should be friends. I'm sorry for everything I've ever done to you. I don't have money. I'm losing my house. I don't have food most of the time for my kids. Can you give me some money?"

But it was never - - he never asked about [the Child]. I mean, he was always kind of, I needed to help him, like I owed him something. But I don't even think he remembers calling me most of the time.

Mother stated that Father showed up at one scheduled visitation and "he was high as a kite." At that time Father had his girlfriend, Ms. Murray, and her son in the car with him. Mother refused to allow Father to take the Child because he was "clearly impaired."

Mother testified that Father's visitation with the Child during the Relevant Time Period was sporadic. She stated: "Some weekends he wouldn't call and he wouldn't meet me, and I wouldn't know why." Mother testified that one weekend Father did visit the Child, but that he brought her back from the visitation early. Mother also testified that Father had an overnight visitation with the Child in April and a one day visit in May of 2011. The visit in May was the last time Father had seen the Child prior to trial. Mother testified that the Child has no memory of Father. Mother testified that she was concerned about allowing Father to take the Child, and she stated:

I had seen him impaired. I knew he was going to a pain clinic. He had, on the phone, verbally told me that he did not have - - he was losing his house. He did not have the money to feed them. Most of the time, he did not have water or electricity. But those are things that I heard and saw with my own ears from him.

After trial, the Trial Court entered its detailed Final Order Terminating Parental Rights on August 19, 2013 finding and holding, *inter alia*:

[Mother] and [Father] began dating in February of 2008 and lived together from April of 2008 until approximately May of 2010.

[Mother] and [Step-father] were married on March 9, 2012.

[Mother and Step-father] petitioned for adoption of [the Child] by [Step-father], and for termination of the parental rights of [Father] on August 23, 2012.

[Father] was personally served with the Petition for Adoption and Termination of Parental Rights on August 29, 2012 at South Central Correctional Facility in Clifton, Tennessee. [Father] has been continuously incarcerated through the Tennessee Department of Corrections from November 15, 2011 to the present. The relevant four (4) month period immediately prior to the current incarceration generally used to assess abandonment by an incarcerated parent was interrupted by a previous, shorter, period of incarceration. Therefore, and the parties stipulated, that the relevant four (4) month period for determining abandonment was March 14, 2011 to July 14, 2011.

[Father] paid no support for [the Child] during the stipulated relevant period of four (4) months. Although [Father] had income from various sources

of at least $2867.00 during this relevant time period, the proof was uncontroverted that [Father] did not support [the Child] at all since the parties separated in May, 2010, including during the relevant period.

[Father] admits that he was deep into prescription pain medication addiction during the relevant period.

[Father] testified that he is aware of a parent's duty to support a child both with and without a court order. [Father] paid no child support before or after a court hearing on March 24, 2011, setting the support at $60.00 per week, and further, failed to appear for a later status check set by the child support court, to determine his job search progress and/or change in employment status.

As established in the stipulated documents, [Father] received unemployment benefits and un-reported wages totaling at least $2867.75 during that four (4) month time period, and further, paid over $1600.00 for visits to the Westbrook Medical Center for pain management consultations and to Rigg[']s Pharmacy to have the pain prescriptions filled. The record documents drug-seeking behavior rather than a true medical need.

The records of Westbrook Medical Center indicate that [Father's] claimed physical ailments could not be medically verified. [Father] also acknowledged a level of physical activity that is inconsistent with the pain he reported. Yet, [Father] did not modify his activity level, working in landscaping, helping friends move, and otherwise moving about without any apparent modification. Notably, the knee pain that [Father] reported at times came from his right knee and other times from the left.

[Father] failed to report his employment with Professional Landscape to the state while he was receiving state unemployment benefits. This reflects on his credibility, as does his longstanding practice of theft and his exaggerated reports of pain to medical professionals. This court finds that [Father] is not a credible witness.

[Father's] criminal records from Knox County Tennessee and Anderson County Tennessee were stipulated and admitted into evidence at trial. [Father] committed Aggravated Burglary on July 14, 2011, during the relevant four-month period, and his pattern of behavior would indicate that he likely had income from other thefts during the relevant period as well. [Father] is able-bodied and was employed and receiving unemployment benefits. He was

able to regularly satisfy his own cravings for drugs, yet at no time, did he pay child support for his daughter, [the Child].

[Father] has a documented history of abusing prescription drugs, and also tested positive for opiates and morphine in excess of the amounts prescribed to him.

The child's mother never hid herself or the child, nor did she indicate that child support was not necessary or would not be accepted. For these reasons, this court FINDS that [Father's] failure to support [the Child] was willful.

[Father] exhibited a wanton disregard for the care and welfare of his daughter, [the Child] prior to his incarceration. [Father] accumulated the following criminal charges from the discovery of [Mother's] pregnancy to date:

June 16, 2011 - Offense: Failure to Appear. He failed to appear for a status check on his job search and/or employment status set by the child support court.

July 14, 2011 - Offense: Aggravated Burglary.

August 1, 2011 - Probation Violation Report - regarding his arrests in Knox County for Failure to Appear, Aggravated Burglary and Theft.

August 23, 2011 - Offense: Theft[.]

August 29, 2011 - Affidavit and Warrant for Probation Violation by violating Rule #1, on July 15, 2011, [Father] was arrested for Aggravated Burglary, Failure to Appear and Theft; Rule #6, failed to attend GED classes or Responsible Thinking group as directed; Rule #8, on June 7, 2011 was instructed to submit to a random drug screen. [Father] then fled the Board of Probation and Parole premises without submitting to the screen; and Rule #9, [Father] is in arrears on his supervision fees and has a balance of $170.

August 29, 2011 - Offense: Theft.

August 31, 2011 - Offense: Theft.

September 1, 2011 - Offense: Theft.

Wanton disregard is evidenced by his criminal behavior, continued incarcerations, drug abuse, failing to meet the child's material needs, his disrespect for authority, conspiring in an armed robbery of another drug dealer/felon, while the child and her two half-siblings and the child's mother were in the home, and the demonstration of a general lack of concern towards this child. What interrupted the period of wanton disregard was not insight, judgment or self-restraint. It was incarceration.

[The Child] resided with her mother exclusively from May of 2010 until March 9, 2012, and with her mother and step-father, Petitioners, from March 9, 2012. The Petitioners are the only parents the child knows. She does not know [Father]. [Father] plays no significant part in the child's life. Petitioners assure that the child's material and emotional needs are abundantly met. Termination of [Father's] parental rights would allow [the Child] to obtain stability though a permanent parent/child relationship with her step-father.

Having found that there are grounds for the termination, the Court engages in the best interest analysis. T.C.A. § 36-1-113 gives us factors that we utilize in determining the best interest of the child, however, the Court is not limited to these factors.

Whether the parent or guardian has made such an adjustment of circumstance, conduct or conditions as to make it safe and in the child's best interest to be in the home with the parent or guardian.

While in prison, [Father], to his credit, has engaged in various classes; anger management classes, drug rehab classes, that theoretically could address some of his impediments. But given [Father's] lifelong involvement in crime and criminal behavior, and associations with criminals, the Court does not believe that [Father] has shown that he has made an adjustment of circumstances, conduct or conditions. And, [Father] remains incarcerated.

We can listen to his promises of better behavior, but he has not actually demonstrated that he is going to make an adjustment in his actual living circumstances at this point. [Father] testified that he has unsuccessfully attempted reform before, and the documentary evidence reflects that. The Court cannot find that he has made those adjustments.

Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible.

Again, [Father] is in prison where his freedom of action is severely constrained. We do not know at this point whether he is going to be able to make any lasting adjustment to his behavior. We have only his promises that are not born out by his past actions.

Whether the parent or guardian has maintained regular visitation or other contact with the child.

The Court does find that [Father's] visitations with the child have been sporadic, in part, due to the mother's reasonable decision not to allow him full access to the child when he was using drugs. By [Father's] own admission, during the time the mother limited visitation he was "out of control." [Father] has brought a lot of his estrangement from [the Child] upon himself with poor judgment.

Whether a meaningful relationship has otherwise been established between the parent or guardian and the child.

The Court is heavily influenced by this factor. This child is four years old. And, over the last two years of this child's life, [Father] has been incarcerated.

The Court does not find that there is any evidence that a meaningful relationship exists between [the Child] and [Father]. During this child's most formative years, [Father], because of his incarceration, has been entirely absent.

The evidence indicates that [the Child] sees [Step-father] as her one and only father. The Court does not believe that it is in her best interest to confuse this child by introducing a person into her life now who lays claim to being her father, when she has only really known one father in her life.

The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition.

Again, this relates to factor number four. This child, during the conscience portion of her life, the portion of her life where she's likely to have

memories, [Step-father] is the only father she has known. Her counselor's letter, stipulated by the parties, indicates the relative emotional relationships between the child and [Step-father], and the child and [Father]. The child has very limited awareness of any father other than [Step-father].

To suddenly introduce a new person into her life, particularly a person with [Father's] past, may not be safe and does not appear to the Court to be in the best interest of [the Child].

Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional, or psychological abuse, or neglect toward other children in the family household.

There was evidence showing brutality and psychological abuse by [Father] in the household, at the very minimum, to [Mother], the biological mother of this child, and to other adults in [Father's] life. [Mother] testified of verbal abuse, and uncontrolled corporal punishment of [the Child's] half-siblings who were in the household half the time.

Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner.

Again, [Father] is in prison. So currently, it is difficult to make a judgment. However, we can look at his past and say very clearly there was criminal activity in the home on a regular basis and the use of controlled substances. He also brought a number of other criminals into his household and into contact with his children.

Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevents the parent or guardian from effectively providing safe and stable care and supervision of the child.

The Court believes, again, that [Father] has shown exceedingly poor judgment in the past that has led him to his current circumstances.

There has not been any evidence produced that [Father] is mentally ill. But it is clear that he has a problem with anger. He has taken some anger management classes, but there is certainly no guarantee that they have been

-16-

effective. If they were, we would probably all be enrolled in one, and anger would be controlled throughout the world. And, that is certainly not the case.

So again, going on what [Father's] history has been, the Court finds it unlikely that his two years in jail will have been so transformative that he will emerge a new creation. In the past, his mental and emotional status has been detrimental to this child, and prevented him from providing safe and stable care for this child.

Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to T.C.A. § 36-5-101.

This factor relates back to our grounds for termination. It is clear that [Father] never supported this child when he had the opportunity.

Given all of these factors, the Court believes that there is clear and convincing evidence that support that it is in the best interest of [the Child] for her legal relationship with [Father] to be terminated so that the adoption that accompanies this petition may proceed as soon as possible.

Therefore, the Court will grant this Petition for Termination of [Father's] parental rights to [the Child].

Father appeals the termination of his parental rights to the Child to this Court.

## Discussion

Although not stated exactly as such, Father raises three issues: 1) whether the Trial Court erred in terminating Father's parental rights to the Child pursuant to Tenn. Code Ann. § 36-1-113(g)(1) and Tenn. Code Ann. § 36-1-102(1)(A)(iv) for abandonment by willful failure to support; 2) whether the Trial Court erred in terminating Father's parental rights to the Child pursuant to Tenn. Code Ann. § 36-1-113(g)(1) and Tenn. Code Ann. § 36-1-102(1)(A)(iv) for abandonment by wanton disregard; and, 3) whether the Trial Court erred in finding that clear and convincing evidence existed that the termination of Father's parental rights was in the Child's best interest.

Our Supreme Court reiterated the standard of review for cases involving termination of parental rights stating:

This Court must review findings of fact made by the trial court *de novo* upon the record "accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise." Tenn. R. App. P. 13(d). To terminate parental rights, a trial court must determine by clear and convincing evidence not only the existence of at least one of the statutory grounds for termination but also that termination is in the child's best interest. *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002) (citing Tenn. Code Ann. § 36-1-113(c)). Upon reviewing a termination of parental rights, this Court's duty, then, is to determine whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence.

*In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006).

In *Department of Children's Services v. D.G.S.L.*, this Court discussed the relevant burden of proof in cases involving termination of parental rights stating:

It is well established that "parents have a fundamental right to the care, custody, and control of their children." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Stanley v. Illinois*, 405 U.S. 645, 92 S. Ct. 1208, 31 L. Ed. 2d 551 (1972)). "However, this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *Id.* (citing *Santosky v. Kramer*, 455 U.S. 745, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982)).

Termination of parental or guardianship rights must be based upon a finding by the court that: (1) the grounds for termination of parental or guardianship rights have been established by clear and convincing evidence; and (2) termination of the parent's or guardian's rights is in the best interests of the child. Tenn. Code Ann. § 36-1-113(c). Before a parent's rights can be terminated, it must be shown that the parent is unfit or substantial harm to the child will result if parental rights are not terminated. *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999); *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Similarly, before the court may inquire as to whether termination of parental rights is in the best interests of the child, the court must first determine that the grounds for termination have been established by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c).

*Dep't of Children's Servs. v. D.G.S.L.*, No. E2001-00742-COA-R3-JV, 2001 Tenn. App. LEXIS 941, at **16-17 (Tenn. Ct. App. Dec. 28, 2001), *no appl. perm. appeal filed*. Clear

and convincing evidence supporting any single ground will justify a termination order. *E.g.,*
*In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

Before we address Father's issues, we note that the Trial Court specifically found Father to be not credible. As our Supreme Court has instructed:

> When credibility and weight to be given testimony are involved, considerable deference must be afforded to the trial court when the trial judge had the opportunity to observe the witnesses' demeanor and to hear in-court testimony. *Estate of Walton v. Young*, 950 S.W.2d 956, 959 (Tenn. 1997) (quoting *Randolph v. Randolph*, 937 S.W.2d 815, 819 (Tenn. 1996)). Because trial courts are able to observe the witnesses, assess their demeanor, and evaluate other indicators of credibility, an assessment of credibility will not be overturned on appeal absent clear and convincing evidence to the contrary. *Wells v. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999).

*Hughes v. Metro. Gov't of Nashville and Davidson County*, 340 S.W.3d 352, 360 (Tenn. 2011). We give the Trial Court's determination as to Father's credibility great deference on appeal.

Turning to the issues raised by Father on appeal, we first consider whether the Trial Court erred in terminating Father's parental rights to the Child pursuant to Tenn. Code Ann. § 36-1-113(g)(1) and Tenn. Code Ann. § 36-1-102(1)(A)(iv) for abandonment by willful failure to support. In pertinent part, Tenn. Code Ann. § 36-1-113(g) provides:

> (g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and non-exclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:
>
> (1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred;

Tenn. Code Ann. § 36-1-113(g)(1) (Supp. 2013). As pertinent to this issue, Tenn. Code Ann. § 36-1-102 provides:

> (1)(A) For purposes of terminating the parental or guardian rights of parent(s) or guardian(s) of a child to that child in order to make that child available for adoption, "abandonment" means that:

* * *

(iv) A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and either has willfully failed to visit or has willfully failed to support or has willfully failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's or guardian's incarceration or the parent or guardian has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child; . . . .

Tenn. Code Ann. § 36-1-102(1)(A)(iv) (2010).

Without reiterating in full the very specific and detailed findings made by the Trial Court with regard to this issue as quoted already, we note that the Trial Court found:

[Father] paid no support for [the Child] during the stipulated relevant period of four (4) months. Although [Father] had income from various sources of at least $2867.00 during this relevant time period, the proof was uncontroverted that [Father] did not support [the Child] at all since the parties separated in May, 2010, including during the relevant period.

The Trial Court further found that Father was aware of his duty to support, and that despite Father's assertions of being unable to pay child support, Father "paid over $1[,]600.00 for visits to the Westbrook Medical Center for pain management consultations and to Rigg[']s Pharmacy to have the pain prescriptions filled" during the Relevant Time Period. The Trial Court also found that Father's claimed aliments could not be medically verified, that Father tested positive for drugs in excess of the amounts prescribed for him, and that Father's behavior was "drug-seeking behavior rather than a true medical need."

The evidence in the record on appeal as discussed more fully above does not preponderate against these findings made by the Trial Court by clear and convincing evidence. We find no error in the Trial Court's determination that grounds to terminate Father's parental rights to the Child pursuant to Tenn. Code Ann. § 36-1-113(g)(1) and Tenn. Code Ann. § 36-1-102(1)(A)(iv) for abandonment by willful failure to support had been proven by clear and convincing evidence.

Next, we consider whether the Trial Court erred in terminating Father's parental rights to the Child pursuant to Tenn. Code Ann. § 36-1-113(g)(1) and Tenn. Code Ann. § 36-

1-102(1)(A)(iv) for abandonment by wanton disregard. The Trial Court made very specific and detailed findings with regard to this issue including:

> Wanton disregard is evidenced by his criminal behavior, continued incarcerations, drug abuse, failing to meet the child's material needs, his disrespect for authority, conspiring in an armed robbery of another drug dealer/felon, while the child and her two half-siblings and the child's mother were in the home, and the demonstration of a general lack of concern towards this child. What interrupted the period of wanton disregard was not insight, judgment or self-restraint. It was incarceration.

The evidence in the record on appeal as discussed more fully above does not preponderate against the Trial Court's findings made by clear and convincing evidence that grounds were proven to terminate Father's parental rights to the Child pursuant to Tenn. Code Ann. § 36-1-113(g)(1) and Tenn. Code Ann. § 36-1-102(1)(A)(iv) for abandonment by wanton disregard.

Father argues in his brief on appeal that it would be unjust to terminate his parental rights upon the ground of abandonment by wanton disregard because although he "did admittedly engage in conduct that would normally constitute wanton disregard, his subsequent repenting of that conduct and serious, successful efforts to correct that conduct should prevent him from having his rights terminated on the basis of wanton disregard." Father argues that he has taken steps while incarcerated "to address his substance abuse issues and to ensure that he has corrected the failures in his conduct that led to the finding of wanton disregard." In support of this assertion, Father cites his own testimony about taking parenting classes, anger management classes, and drug rehabilitation classes while in prison.

In reality Father is not arguing that the Trial Court erred in finding wanton disregard. Rather, Father's argument actually is that despite the finding of wanton disregard, it would not be in the best interest of the Child for Father's parental rights to be terminated. This leads us to the final issue as raised by Father, whether the Trial Court erred in finding that clear and convincing evidence was proven that it was in the Child's best interest for Father's parental rights to be terminated.

As discussed more fully above, the Trial Court carefully considered the non-exclusive factors listed in Tenn. Code Ann. § 36-1-113(i) and made detailed and specific findings relative to these factors. In addition, the Trial Court specifically found Father to be not credible. The Trial Court found that despite Father's assertions regarding classes he has taken in prison, that "given [Father's] lifelong involvement in crime and criminal behavior, and associations with criminals, the Court does not believe that [Father] has shown that he has

-21-

made an adjustment of circumstances, conduct or conditions." The Trial Court also found that Father had "not actually demonstrated that he is going to make an adjustment in his actual living circumstances at this point," and that it was "unlikely that his two years in jail will have been so transformative that he will emerge a new creation." We give these credibility determinations as made by the Trial Court great weight on appeal.

The record on appeal reveals that the Trial Court carefully considered all of the relevant factors when making its determination about the best interest of the Child. The evidence in the record on appeal does not preponderate against the Trial Court's findings relative to this issue. We find no error in the Trial Court's determination that clear and convincing evidence was proven that it was in the Child's best interest for Father's parental rights to be terminated.

As grounds to terminate Father's parental rights were proven by clear and convincing evidence, and it was proven by clear and convincing evidence that the termination of Father's parental rights was in the Child's best interest, we affirm the Trial Court's August 19, 2013 judgment terminating Father's parental rights to the Child.

## **Conclusion**

The judgment of the Trial Court is affirmed, and this cause is remanded to the Trial Court for collection of the costs below. The costs on appeal are assessed against the appellant, Joshua A.P.

_____
D. MICHAEL SWINEY, JUDGE