IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs May 1, 2017

**IN RE E.C.**

**Appeal from the Juvenile Court for Washington County**
**No. 47-409    Sharon M. Green, Judge**

_____

**No. E2016-02582-COA-R3-PT**

_____

In this termination of parental rights action, Father's parental rights were terminated based on the following grounds: (1) failure to manifest an ability and willingness to assume legal and physical custody of the child; (2) that placing the child in Father's legal and physical custody would pose a risk of substantial harm to the child's physical and psychological welfare; (3) failure to establish or exercise paternity; and (4) abandonment by wanton disregard for the welfare of the child.  We affirm the grounds of failure to manifest an ability and willingness to assume legal and physical custody of the child and failure to establish or exercise paternity.  However, we reverse with respect to the remaining grounds.  We also affirm the trial court's determination that termination of Father's parental rights is in the best interest of the child. Affirmed in part, reversed in part, and remanded.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed in Part; Reversed in Part; and Remanded**

J. STEVEN STAFFORD, P.J.,W.S., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and ANDY D. BENNETT, J., joined.

Rachel Ratliff, Johnson City, Tennessee, for the appellant, Michael B.

Herbert H. Slatery, III, Attorney General and Reporter; Jordan K. Crews, Assistant Attorney General, for the appellee, State of Tennessee, Department of Children's Services.

**OPINION**

**BACKGROUND**

Michael B. ("Father") is the biological father of E.C. ("the child"), born in February 2015, who is the subject of this termination proceeding.[1] The child's mother, Crystal C. ("Mother") has previously surrendered her parental rights to the child. As a result, Mother is not a party to this appeal.

Prior to the child's birth, on January 23, 2014, Father pled guilty to two counts of promotion of methamphetamine manufacture and one count of initiating the process to manufacture methamphetamine in the Carter County Criminal Court ("criminal court"). The offense dates for these convictions occurred on March 30, 2013; April 5, 2013; and May 4, 2013. With respect to the conviction of two counts of promotion of methamphetamine manufacture, Father was sentenced to two years of supervised probation. With respect to the conviction of one count of initiating the process to manufacture methamphetamine, Father was sentenced to nine years of supervised probation to run concurrently with his other convictions.

On February 28, 2014, Father was released from jail and began serving his fully probated sentence for the aforementioned convictions. As a condition of his probation, Father was required to participate in drug testing. At some point after being placed on probation but prior to the child's birth, Father violated his probation by testing positive for cocaine and opiates. It appears that Father evaded law enforcement for a time; accordingly, an order revoking Father's probation based on his positive drug screen for cocaine and opiates was not entered until May 27, 2015, over a year later. The order revoking his probation was therefore also based on the fact that Father had absconded. Father was subsequently released from incarceration on house arrest and remained out of jail for thirty-five days.[2] As a condition of both his release and probation, Father was to report to community corrections for intake on June 3, 2015; however, Father failed to do so. On June 22, 2015, a warrant was issued for Father's arrest for his failure to report to community corrections and for absconding. On July 9, 2015, Father was arrested on the warrant. On October 12, 2015, the criminal court revoked the community corrections sentence because Father was found to have violated his probation for "fail[ure] to report for intake on June 3, 2015" and for "abscond[ing] from community corrections." As a result, Father was sentenced to serve his nine-year sentence in the Tennessee Department of Corrections as a standard offender at thirty-percent. The Tennessee felony offender

---

[1] In cases involving termination of parental rights, it is the policy of this Court to remove the names of minor children and other parties in order to protect their identities.

[2] Father testified that he was released on May 27, 2015. However, the warrant for his arrest shows that Father was re-arrested on July 9, 2015. The period of time between May 27, 2015, and July 9, 2015, is longer than thirty-five days. At trial, the parties repeatedly referred to the period of time that Father was out of jail in 2015 as the thirty-five day period. It is possible that the parties began the count on June 4, 2015, the day after Father failed to report for intake. Regardless of when Father was released, we will refer to the period of time that Father remained out of jail in 2015 as the thirty-five day period for consistency.

registry lists Father's next parole hearing for December 2018, with a release date of October 1, 2023.

In the meantime, the child was born in February 2015. During the period of time that Father was evading law enforcement on his first probation violation, the record is unclear as to his knowledge of the conception and birth of the child. The child's birth certificate does not list a father. The Tennessee Department of Children's Services ("DCS") filed a petition for temporary legal custody of the child on August 24, 2015, based on allegations of "drug-expos[ure], lack of supervision, and physical abuse." On August 25, 2015, while Father was incarcerated, the Johnson City Juvenile Court ("trial court") issued an emergency protective custody order, removing the child from Mother's home and placing her into the custody of DCS for foster care. On December 11, 2015, DNA testing was completed, confirming Father as the child's biological parent, but no order establishing paternity was entered until August 5, 2016. The child was adjudicated dependent and neglected on December 16, 2015, based on Father's stipulation.

On June 29, 2016, DCS petitioned to terminate Father's the parental rights to the child. The petition alleged the following grounds for termination: (1) persistence of conditions; (2) abandonment by wanton disregard; and (3) failure to establish/exercise paternity.[3] On September 13, 2016, Father filed an answer to the petition to terminate parental rights, denying all material allegations. A bench trial was conducted on November 22, 2016, with Father participating by telephone.

Jacosha Alexander, a DCS caseworker assigned to the matter, testified that, prior to the filing of the termination petition, Ms. Alexander consulted the putative father registry and confirmed that only Father claimed paternity to the child. According to Ms. Alexander, the child had been in DCS custody continuously for sixteen months as of the date of trial. Ms. Alexander testified that two child protective services cases were initiated prior to the removal of the child from the home and that Father was incarcerated at the time of both referrals.[4]

Ms. Alexander also testified that Father had not yet completed any substance abuse treatment because he was still on the waiting list but conceded on cross-examination that there was nothing Father could do to expedite the process. As of the date of the filing of the termination petition, Ms. Alexander testified that Father had not

---

[3] In the body of the termination petition, DCS appears to have alleged all of the grounds under Tennessee Code Annotated section 36-1-113(g)(9)(A) against Father. We note that throughout the prior proceedings and in the court documents, DCS and the trial court grouped and referred to all of the grounds under Tennessee Code Annotated section 36-1-113(g)(9)(A) as "failure to establish/exercise paternity" even though failure to establish paternity is only one of six grounds under Tennessee Code Annotated section 36-1-113(g)(9)(A). However, for clarity, we will list each of the separate grounds actually relied upon and referred to under Tennessee Code Annotated section 36-1-113(g)(9)(A) later in this Opinion.

[4] The record is unclear as to the exact dates when these cases were initiated.

been visiting with the child, had not manifested a willingness and ability to take custody of the child, and did not file a petition to establish paternity after he claimed to be the child's father. When asked whether Ms. Alexander had concerns that placing the child in Father's custody would pose a risk of substantial harm to the child's physical and psychological welfare, Ms. Alexander responded in the affirmative. Ms. Alexander also expressed concerns that Father "may [have] two holds in Florida" and that Father would not be released until December 2018 at the earliest, when the child would be turning four years old. Ms. Alexander testified that she kept Father updated on how the child was doing and sent him pictures of the child. Ms. Alexander conceded on cross-examination that Father had repeatedly told her that he would like to have custody of the child upon his release.

Ms. Alexander testified that the child was currently in a pre-adoptive home and had been in the same foster home the entire duration of her stay in DSC custody. Based on Ms. Alexander's observations of the foster home, which she visits twice a month, the child is "very happy, healthy[,] and bouncing around," the child is "doing really well," and the child has bonded with the foster parents. According to Ms. Alexander, the child would be negatively impacted if she were to be moved from the foster home.

Brittany Killebrew, the foster mother for the child, testified that the child had been in her home for sixteen months, the amount of time that the child had been in DCS custody. According to Ms. Killebrew, the child is doing very well in her and her husband's care and has her own room and toys in their home. Ms. Killebrew testified that the child attends day care, never misses any of her various medical appointments, and spends time with their extended family. Ms. Killebrew also testified that the child calls her and her husband mom and dad and that they love the child very much. If the child were made available for adoption, Ms. Killebrew testified that she and her husband would move forward with adopting the child.

Father testified that he first violated his probation "several days" after he was first released from jail on February 28, 2014, for failing a drug screen. Although this first violation occurred a year before the child was even born, Father was not charged with the violation until May 27, 2015, three months after the child's birth. According to Father, the only bad conduct that occurred after he learned of the child's birth was the violation of his house arrest subsequent to his release on May 27, 2015, based on his failure to report for intake on June 3, 2015. Father explained that he already filled out a home plan for his parole to be served at his parents' house, and his mother had already given her permission. However, Father testified:

> The only . . . thing I violated was the house arrest when I got out [o]n May 27th, I believe, and that's only because I didn't have nowhere to go because . . . my mom and dad were on vacation at the time and me and [Mother] were no longer together and I couldn't go there, but I did go over and visit

the [child] every day and make sure she had diapers and bought her a swing and brought her clothes and, and whatever else she needed, up until that point where they violated my house arrest for not reporting.

Father admitted on cross-examination that he knew the child was his daughter at this time. According to Father, he and Mother planned to go to city hall to get the child's birth certificate "straightened out" but never had the chance because the warrant was issued for his failure to report for intake. Father admitted that he knew that failing to report to his probation officer would result in his incarceration; however, Father maintained that his "hands were tied" because he "had nowhere to go."

Father testified that, upon his release, he would automatically receive a check for his disability and would be allowed to work a part-time job. According to Father, he would stay with his parents in their four-bedroom house. Father testified that he was informed he would make parole if he received no write-ups and maintained good behavior.[5] Father testified that he wants to be a father to the child and that he will have the ability to do so upon his release from incarceration. Father asserted that he wrote letters to the foster parents asking for updates and pictures of the child; however, other than the one picture that Ms. Alexander sent to him, Father had not received any correspondence from the foster parents.

The court issued an oral ruling at the conclusion of trial and subsequently memorialized its ruling in a written order on December 13, 2016. Therein, the trial court first dismissed the ground of persistence of conditions because Father was incarcerated when the child was removed from Mother's home into DCS custody. The trial court then terminated Father's parental rights on the following grounds: (1) failure to manifest an ability and willingness to assume legal and physical custody of the child; (2) that placing the child in Father's legal and physical custody would pose a risk of substantial harm to the child's physical and psychological welfare; (3) failure to establish or exercise paternity; and (4) abandonment by wanton disregard for the welfare of the child.[6] The

---

[5] According to Father, at his first parole hearing, the parole officer told him she would put him off for eighteen months, which would have made his eligibility date in 2017. However, Father testified that the officer entered 2018 into the computer instead of eighteen months, and Father purportedly filed an appeal on his parole to get this changed.

[6] Although DCS appears to have alleged all six grounds under Tennessee Code Annotated section 36-1-113(g)(9)(A) in the termination petition, as discussed in footnote 3, the trial court orally ruled that "the subsections of [Tennessee Code Annotated section 36-1-113(g)(9)(A)] which are applicable to the facts in this case are that [Father] has failed to manifest an ability and willingness to assume legal and physical custody of the child" pursuant to Tennessee Code Annotated section 36-1-113(g)(9)(A)(iv); "placing custody of the child [in] [Father's] legal and physical custody would pos[e] a risk of substantial harm to the physical or psychological welfare of the child" pursuant to Tennessee Code Annotated section 36-1-113(g)(9)(A)(v); and Father "has failed to file a petition to establish paternity of the child within thirty days after notice of the alleged paternity" pursuant to Tennessee Code Annotated section 36-1-113(g)(9)(A)(vi). Accordingly, the trial court appears to have rejected the first three grounds under

trial court also determined that termination was in the child's best interest. Father appealed.

## ISSUES

Father raises the following issues for our review, which we have slightly restated:

1. Whether the trial court properly determined that grounds existed to terminate Father's parental rights.
    A. Father failed to manifest an ability and willingness to assume legal and physical custody of the child.
    B. Placing the child in Father's legal and physical custody would pose a risk of substantial harm to the child's physical and psychological welfare
    C. Father failed to establish or exercise paternity.
    D. Father abandoned the child by wanton disregard.
2. Whether the trial court properly determined that termination of Father's parental rights was in the best interests of the minor child.

## STANDARD OF REVIEW

As explained by the Tennessee Supreme Court:

A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions. ***Troxel v. Granville***, 530 U.S. 57, 65 (2000); ***Stanley v. Illinois***, 405 U.S. 645, 651 (1972); ***In re Angela E.***, 303 S.W.3d 240, 250 (Tenn. 2010); ***In re Adoption of Female child***, 896 S.W.2d 546, 547–48 (Tenn. 1995); ***Hawk v. Hawk***, 855 S.W.2d 573, 578–79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. ***In re Angela E.***, 303 S.W.3d at 250. "'[T]he [S]tate as parens patriae has a special duty to protect minors . . . .' Tennessee law, thus, upholds the [S]tate's authority as parens patriae when interference with parenting is necessary to prevent serious harm to a child." ***Hawk***, 855 S.W.2d at 580 (quoting ***In re Hamilton***, 657 S.W.2d

---

Tennessee Code Annotated section 36-1-113(g)(9)(A). DCS does not challenge the trial court's finding that it failed to prove the first three grounds under Tennessee Code Annotated section 36-1-113(g)(9)(A). The Tennessee Supreme Court in ***In re Carrington H.***, 483 S.W.3d 507 (Tenn. 2016), ruled that this Court must consider all of the grounds found by the trial court, "regardless of whether **the parent** challenges these findings on appeal." ***Id.*** at 525–26 (emphasis added). The rule adopted in ***In re Carrington H.*** has never been construed to require this Court to also consider the grounds not sustained by the trial court and thereafter not appealed by the non-parent. Accordingly, we will only consider the grounds found by the trial court and appealed by Father in this case.

425, 429 (Tenn. Ct. App. 1983)); *see also* **Santosky v. Kramer**, 455 U.S. 745, 747 (1982); **In re Angela E.**, 303 S.W.3d at 250.

**In re Carrington H.**, 483 S.W.3d 507, 522–23 (Tenn. 2016) (footnote omitted).

Our termination statutes identify "those situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought." **In re Jacobe M.J.**, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013) (quoting **In re W.B.**, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005)). A person seeking to terminate parental rights must prove both the existence of one of the statutory grounds for termination and that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c); **In re D.L.B.**, 118 S.W.3d 360, 367 (Tenn. 2003); **In re Valentine**, 79 S.W.3d 539, 546 (Tenn. 2002).

Because of the fundamental nature of the parent's rights and the grave consequences of the termination of those rights, courts must require a higher standard of proof in deciding termination cases. **Santosky**, 455 U.S. at 769. Consequently, both the grounds for termination and the best interest inquiry must be established by clear and convincing evidence. Tenn. Code Ann. § 36-3-113(c)(1); **In re Valentine**, 79 S.W.3d at 546. Clear and convincing evidence "establishes that the truth of the facts asserted is highly probable . . . and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." **In re M.J.B.**, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004). Such evidence "produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established." **Id.** at 653.

As opined by the Tennessee Supreme Court:

The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. **In re M.L.P.**, 281 S.W.3d [387,] 393 [(Tenn. Ct. App. 2009)] (quoting **In re Adoption of A.M.H.**, 215 S.W.3d [793], 810 [(Tenn. 2007)]). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. **In re Angela E.**, 303 S.W.3d at 246.

**In re Carrington H.**, 2016 WL 819593, at *12.

When the resolution of an issue in a case depends upon the truthfulness of witnesses, the trial judge, who has had the opportunity to observe the witnesses and their manner and demeanor while testifying, is in a far better position than this Court to decide those issues. *See* **McCaleb v. Saturn Corp.**, 910 S.W.2d 412, 415 (Tenn. 1995); **Whitaker v. Whitaker**, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997). The weight, faith,

and credit to be given to any witness's testimony lies in the first instance with the trier of fact, and the credibility accorded will be given great weight by the appellate court. ***Walton v. Young***, 950 S.W.2d 956, 959 (Tenn. 1997).

## DISCUSSION

### Grounds for Termination

The trial court found four grounds for terminating Father's parental rights: (1) failure to manifest an ability and willingness to assume legal and physical custody of the child pursuant to Tennessee Code Annotated section 36-1-113(g)(9)(A)(iv); (2) placing custody of the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child pursuant to Tennessee Code Annotated section 36-1-113(g)(9)(A)(v); (3) failure to file a petition to establish paternity of the child pursuant to Tennessee Code Annotated section 36-1-113(g)(9)(A)(vi); and (4) abandonment by wanton disregard for the welfare of the child. We begin our discussion with the first three grounds pursuant to Tennessee Code Annotated section 36-1-113(g)(9)(A), applicable to putative, non-legal fathers.

*Tennessee Code Annotated Section 36-1-113(g)(9)(A) Grounds*

Tennessee Code Annotated section 36-1-113(g)(9)(A) provides additional grounds for termination applicable to putative fathers, in relevant part:

> (9)(A) The parental rights of any person who, at the time of the filing of a petition to terminate the parental rights of such person, . . . is the putative father of the child may also be terminated based upon any one (1) or more of the following additional grounds:
> * * *
> (iv) The person has failed to manifest an ability and willingness to assume legal and physical custody of the child;
> (v) Placing custody of the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child; or
> (vi) The person has failed to file a petition to establish paternity of the child within thirty (30) days after notice of alleged paternity, or as required in § 36-2-318(j), or after making a claim of paternity pursuant to § 36-1-117(c)(3)[.]

Tenn. Code Ann. § 36-1-113(g)(9)(A). Prior to March 2016, under the previous version of the statute, there was some question regarding whether these additional grounds were applicable to putative fathers. *See **In re Bernard T.**, 319 S.W.3d 586, 599 (Tenn. 2010) (citing **In re D.A.H.**, 142 S.W.3d 267, 272–73 (Tenn. 2004)) ("The grounds for

termination in Tenn. Code Ann. § 36-1-113(g)(9) cannot be used to terminate the rights of a person who is a child's biological parent, legal parent, or putative biological father at the time the termination petition is filed."). *But see **In re Dixie M.M.***, No. M2012-01226-COA-R3-PT, 2012 WL 4474155, at *8 (Tenn. Ct. App. Sept. 27, 2012) (affirming the trial court's termination of the putative father's parental rights on the ground of failure to seek reasonable visitation with the child pursuant to Tennessee Code Annotated section 36-1-113(g)(9)(A)(iii)). On March 23, 2016, the legislature amended the wording of the statute to explicitly state that these additional grounds applied to "the putative father of the child." *See* 2016 Pub. Acts, c. 636, § 5, eff. Mar. 23, 2016.

Here, the trial court found that the petition to terminate parental rights was filed after the legislature amended the statute. Because neither party disputes the trial court's finding that the current version of section 36-1-113(g)(9) applies in this case, we will assume that the March 2016 amendment is applicable here.

In order to determine whether clear and convincing evidence exists to terminate Father's parental rights under section 36-1-113(g)(9)(A), we must first determine whether Father is a putative father. A "putative father" is statutorily defined as follows:

> (43) "Putative father" means a biological or alleged biological father of a child who, at the time of the filing of a petition to terminate the parental rights of such person . . . meets at least one (1) of the criteria set out in § 36-1-117(c) and is not a legal parent[.]

Tenn. Code Ann. § 36-1-102(43). Pursuant to Tennessee Code Annotated section 36-1-117(c), in relevant part:

> (c) The parental rights of the putative father of a child who has not filed a petition to establish paternity of the child or who has not established paternity of the child who is the subject of an adoption proceeding and who meets any of the following criteria shall be terminated by surrender, parental consent, termination of parental rights pursuant to § 36-1-113, or by waiver of interest, before the court may enter an order of adoption concerning that child:
>
>      *   *   *
>
> (2) The biological father has been specifically identified to the petitioners or their attorney, or to the department, the licensed child-placing agency, or the licensed clinical social worker involved in the care, placement, supervision, or study of the child as the child's father by the child's biological mother in a sworn, written statement or by other information that the court determines to be credible and reliable[.]

Tenn. Code Ann. § 36-1-117(c).

Here, the trial court found that Father is a putative father for purposes of the termination proceedings because Mother identified Father as the child's father to DCS, and it is undisputed that Father did not qualify as a legal parent at the time of the filing of the termination petition.[7]  The record shows that the DNA testing was completed on December 11, 2015, and the trial court entered an order establishing paternity on August 5, 2016, before the hearing on the termination petition took place.[8]  In addition, no father is listed on the child's birth certificate, and there is evidence that only Father claimed paternity to the child. Indeed, only Father's name is listed on the putative father registry. As such, there is "credible and reliable" evidence that the trial court could rely on in order to classify Father as a putative father, and the trial court properly classified Father as a putative father for purposes of the termination proceedings.

Father asserts, however, that DCS's failure to exert reasonable efforts to help him establish paternity contributed to his status as merely a putative father at the time the

---

[7] A legal parent is defined as:

(28)(A) "Legal parent" means:

(i) The biological mother of a child;
(ii) A man who is or has been married to the biological mother of the child if the child was born during the marriage or within three hundred (300) days after the marriage was terminated for any reason, or if the child was born after a decree of separation was entered by a court;
(iii) A man who attempted to marry the biological mother of the child before the child's birth by a marriage apparently in compliance with the law, even if the marriage is declared invalid, if the child was born during the attempted marriage or within three hundred (300) days after the termination of the attempted marriage for any reason;
(iv) A man who has been adjudicated to be the legal father of the child by any court or administrative body of this state or any other state or territory or foreign country or who has signed, pursuant to §§ 24-7-113, 68-3-203(g), 68-3-302 or 68-3-305(b), an unrevoked and sworn acknowledgment of paternity under Tennessee law, or who has signed such a sworn acknowledgment pursuant to the law of any other state, territory, or foreign country; or
(v) An adoptive parent of a child or adult;
(B) A man shall not be a legal parent of a child based solely on blood, genetic, or DNA testing determining that he is the biological parent of the child without either a court order or voluntary acknowledgement of paternity pursuant to § 24-7-113 . Such test may provide a basis for an order establishing paternity by a court of competent jurisdiction, pursuant to the requirements of § 24-7-112[.]

Tenn. Code Ann. § 36-1-102(28).

[8] Because the order establishing paternity was entered after the filing of the termination petition, however, Father was not a legal father at the time of the filing of the termination petition. *See **In re Ashton B.***, No. W2015-01864-COA-R3-PT, 2016 WL 981320, at *8 (Tenn. Ct. App. Mar. 15, 2016), *perm. app. denied* (Tenn. July 6, 2016) (concluding that, although the father was deemed the legal parent of the child only after the termination of parental rights petition was filed, father was not the child's legal parent at the time of the filing of the termination petition).

termination petition was filed. In a previous case, we have held that DCS could not seek to terminate father's parental rights on the ground of failure to establish parentage when DCS "made [no] effort to assist [f]ather to establish parentage." *In re Dixie M.M.*, No. M2012-01226-COA-R3-PT, 2012 WL 4474155, at *8 (Tenn. Ct. App. Sept. 27, 2012). However, we agree with DCS that the Tennessee Supreme Court's opinion in *In re Kaliyah S.*, 455 S.W.3d 533 (Tenn. 2015), decided after *In re Dixie M.M.*, is controlling in this case. In *In re Kaliyah S.*, the supreme court held that, as a general rule, DCS is not required to prove that it exerted reasonable efforts as a precondition to terminating a parent's parental rights. *Id.* at 555. Rather, the extent of DCS's efforts to reunify the family in a termination proceeding is weighed in the trial court's best-interest analysis. *Id.* Our supreme court noted a single exception to this general rule: because the ground for termination of abandonment by failure to provide a suitable home expressly references DCS's reasonable efforts, such efforts must be shown to rely on this ground. *Id.* at 554 n.31; *see* Tenn. Code Ann. § 36-1-102(1)(A)(ii). Neither the ground of failure to establish paternity nor the other grounds applicable to Father expressly require that DCS exert reasonable efforts to assist Father in establishing himself as a legal parent. As a result, we respectfully reject Father's contention that DCS's failure to exert reasonable efforts to help him establish paternity in this case warrants reversal of all of the grounds found by the trial court under section 36-1-113(g)(9)(A).

Having established that Father is a putative father and not a legal father, we will now discuss whether DCS proved by clear and convincing evidence the grounds under section 36-1-113(g)(9)(A): (1) failure to manifest an ability and willingness to assume legal and physical custody of the child pursuant to section 36-1-113(g)(9)(A)(iv); (2) that placing the child in Father's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child pursuant to section 36-1-113(g)(9)(A)(v); and (3) failure to establish paternity pursuant to section 36-1-113(g)(9)(A)(vi). "These grounds are less difficult to prove than the grounds in Tenn[essee] Code Ann[otated section] 36-1-113(g)(1)–(8) . . . partially because they do not include a willfulness requirement." *In re H.A.L.*, No. M2005-00045-COA-R3-PT, 2005 WL 954866, at *9 (Tenn. Ct. App. Apr. 25, 2005). We will consider each of these grounds in turn.

With respect to the ground of failure to manifest an ability and willingness to assume legal and physical custody of the child pursuant to section 36-1-113(g)(9)(A)(vi), the trial court found that, although Father testified that he was willing to take custody of the child upon his release, Father failed to manifest the willingness and ability to take custody of the child. Specifically, the trial court found that Father "is not in a position to care for the child at this time." The record does not preponderate against the trial court's findings of fact with regard to this ground. Here, although Father stated his intention that he was willing to take custody of the child, Father manifested the opposite intention based on his actions. "[I]n parental rights matters, the court does not look to the protestations of affections and expressed intentions of the parent, but rather the parent's

- 11 -

course of conduct." ***In re Weston T.R.***, No. M2012-00580-COA-R3-PT, 2012 WL 3804414, at \*7 (Tenn. Ct. App. Aug. 31, 2012) (quoting ***State of Tenn., Dep't of Children's Servs. v. J .M.F.***, 2005 WL 94465, at \*7 (Tenn. Ct. App. Jan. 11, 2005)); *see* ***In re Rebecca J.R.M.***, No. E2013-00996-COA-R3-PT, 2013 WL 6529568, at \*11 (Tenn. Ct. App. Dec. 12, 2013) ("Although [f]ather testified that he had a desire to raise the [c]hild, [f]ather's actions belie his words."). The record shows that Father was re-incarcerated by Father's own conduct of failing to report or do what was necessary to stay out of jail in order to care for the child. Indeed, based on Father's own testimony, he was aware that his failure to abide by the terms of his house arrest would result in his re-incarceration. Although Father testified that he was homeless while his parents were on vacation and therefore was unable to report to a certain location for his house arrest, there is no evidence that Father contacted his probation officer or anyone else to remedy the situation. As a result, Father violated his house arrest and was required to serve his nine-year sentence. Thus, Father's actions show an unwillingness to act in a way that would allow him to assume custody of the child. We therefore affirm the trial court's termination of Father's parental rights on this ground.

We next consider whether DCS presented clear and convincing evidence that placing the child in Father's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child such that termination of Father's parental rights is proper pursuant to section 36-1-113(g)(9)(A)(v). The trial court terminated Father's parental rights on this ground because it "could not place the child in the care of a parent who is incarcerated." When asked at trial whether Ms. Alexander had "concerns that placing the child in the custody of [Father] would pose a risk of substantial harm to the child's physical and psychological welfare," she merely answered "[y]es" without any further explanation.

This Court has previously made the following observation:

The courts have not undertaken to define the circumstances that pose a risk of substantial harm to a child. These circumstances are not amenable to precise definition because of the variability of human conduct. However, the use of the modifier "substantial" indicates two things. First, it connotes a real hazard or danger that is not minor, trivial, or insignificant. Second, it indicates that the harm must be more than a theoretical possibility. While the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.

The courts have likewise not provided clear directions regarding the amount of proof required to establish that a child will be exposed to substantial harm if he or she is placed in the custody of a biological parent rather than a third party.

- 12 -

*Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001) (footnotes omitted). "Custody decisions should not be used to punish parents for past misconduct or to award parents for exemplary behavior." *In re Adoption of W.J.P.*, No. E2007-01043-COA-R3-PT, 2008 WL 246015, at *11 (Tenn. Ct. App. Jan. 30, 2008) (citing *Rice v. Rice*, 983 S.W.2d 680, 683 (Tenn. Ct. App. 1998)). "The courts understand that persons are able to turn their lives around[.]" *Id.* (citing *In re Askew*, 993 S.W.2d 1, 2 (Tenn. 1999)). "Accordingly, custody decisions should focus on the parties' present and anticipated circumstances . . . and on the parties' current fitness to be custodians of children." *Id.* (citations omitted).

Here, the trial court based its decision solely on Father's incarcerated status. We have never held that a parent's mere status as an inmate clearly and convincingly establishes that placing the child in the parent's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child. *Cf. In re F.N.M.*, No. M2015-00519-COA-R3-PT, 2016 WL 3126077, at *13 (Tenn. Ct. App. Apr. 11, 2016) (holding that petitioners proved by clear and convincing evidence the ground of substantial and psychological harm because there was evidence of a significant bond between the child and petitioners, evidence of the lack of a relationship with father due to father's incarceration, and the testimony of a "completely credible" child psychiatrist who "outlined the adverse psychological and physical effects a child experiences if taken away from the person or persons with whom the child has bonded"); *In re Adoption of S.T.D.*, No. E2007-01240-COA-R3-PT, 2007 WL 3171034, at *9–10 (Tenn. Ct. App. Oct. 30, 2007) (affirming the ground of substantial harm to the physical or psychological welfare of the children based on testimony that, while in father's care, the children lost weight, became congested, developed diaper rashes, and their hunger cries were ignored); *State v. C.H.H.*, No. E2001-02107-COA-R3-CV, 2002 WL 1021668, at *9 (Tenn. Ct. App. May 21, 2002) (affirming the ground of substantial harm based on evidence of the child's bond with the foster parents and attachment to her siblings, and a licensed clinical social worker's observation that father "has no regard for the strong bond the [c]hild has with her siblings and with the foster family"). As a result, without more, we disagree that DCS met its burden by clear and convincing evidence that placing the child in Father's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child and therefore reverse the trial court's termination of Father's parental rights on this ground.

Finally, we consider whether DCS proved by clear and convincing evidence that Father failed to establish paternity pursuant to Tennessee Code Annotated section 36-1-113(g)(9)(A)(vi). It is undisputed that Father knew that he was the child's biological father on May 2015, at the latest, but nevertheless never filed a petition to establish paternity while he was out of jail on house arrest for thirty-five days. Indeed, Father testified that, during this time, he and Mother intended to "straighten[] out" the child's birth certificate, indicating that he was aware of his duty to legitimate the child. Father, however, failed to do so because he violated his probation for failure to report for intake.

- 13 -

Although Tennessee Code Annotated section 36-1-113(g)(9)(A)(vi) requires that Father "file a petition to establish paternity of the child within thirty . . . days after notice of alleged paternity," we note that Father was out of jail for thirty-five days, giving him sufficient time to accomplish this task. In addition, the order establishing paternity was not entered until August 2016, eight months after the DNA paternity test was completed and long after the thirty-day limit contemplated by statute. Under these circumstances, we therefore affirm the trial court's ruling that clear and convincing evidence existed to terminate Father's parental rights on the ground of failure to establish paternity.

*Abandonment by Wanton Disregard*

At the outset, we note that the ***In re Bernard T.*** court explicitly held that, where any of the section 36-1-113(g)(9)(A) grounds are applicable, the grounds in section 36-1-113(g)(1) through section 36-1-113(g)(8) are inapplicable. *See **In re Bernard T.**,* 319 S.W.3d at 604 ("[Father's] rights with regard to [the child] can be terminated based only on one of the six grounds in Tenn[essee] Code Ann[otated section] 36-1-113(g)(9) [because he was not a legal father at the time of the filing of the termination petition], not on any of the other grounds in Tenn[essee] Code Ann[otated section] 36-1-113(g)."). As noted earlier, section 36-1-113(g)(9)(A) was amended in 2016, resulting in substantive changes to the statute. Based on this very recent change, no court has yet considered whether the 2016 amendment affected this part of the holding in ***In re Bernard T.*** Father does not argue however that, if one of the 36-1-113(g)(9)(A) grounds applies, then the section 36-1-113(g)(1) ground that was alleged against him was inapplicable. Moreover, regardless of its applicability, as discussed in detail *infra*, we conclude this ground was not proven by clear and convincing evidence. Consequently, we proceed to consider the final ground for termination—abandonment by an incarcerated parent by wanton disregard for the welfare of the child.

Pursuant to Tennessee Code Annotated section 36-1-113(g)(1), "[a]bandonment by the parent or guardian" constitutes a ground for termination of a parent's parental rights. Tennessee Code Annotated section 36-1-102, in turn, provides several definitions for abandonment. In this case, the petition alleged, and the trial court found, abandonment by an incarcerated parent for wanton disregard under Tennessee Code Annotated section 36-1-102(a)(iv). Section 36-1-102(a)(iv) provides:

> (iv) A parent . . . is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent . . . has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and . . . the parent . . . . has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child[.]

Tenn. Code Ann. § 36-1-102(1)(A)(iv).

The statute "begins by describing the class of people to whom the statute applies." *In re Audrey S.*, 182 S.W.3d 838, 870 (Tenn. Ct. App. 2005). As is evident from the language of the statute, the grounds under Section 36-1-102(1)(A)(iv) applies only where "the parent . . . has been incarcerated during all or part of the four (4) months immediately preceding the institution of [a parental termination] proceeding." In this case, the trial court made the following specific findings concerning the ground of abandonment by an incarcerated parent for wanton disregard:

> 9. . . . [T]he [c]ourt finds that the relevant four (4) month period preceding the filing of the termination petition began on February 29, 2016, and ended on June 28, 2016.
> 10. The [c]ourt finds that [Father] was in jail for the entire four (4) month period immediately preceding the filing of the . . . Petition to Terminate Parental Rights. Specifically, the [c]ourt finds that [Father] was arrested in July of 2015 upon a charge of Violation of Probation. Further. The [c]ourt finds that [Father] has been incarcerated since that time and has yet to be released from prison.

Because Father was incarcerated for the entire four months preceding the filing of the termination petition, the trial court correctly concluded that the abandonment definition contained in section 102(1)(A)(iv) was applicable. *See In re Keith W.*, No. W2016-00072-COA-R3-PT, 2016 WL 4147011, at *6 (Tenn. Ct. App. Aug. 3, 2016) (holding that the incarcerated parent definitions for abandonment did not apply because the father was not incarcerated at or in the four months preceding the filing of the termination petition); *see In re Navada N.*, No. M2015-01400-COA-R3-PT, 2016 WL 3090908, at *14 (Tenn. Ct. App. May 23, 2016) (describing incarceration within the four months preceding the filing of the termination petition as a "condition precedent" to the application of the abandonment definitions under section 36-1-102(1)(A)(iv)). We will therefore proceed to consider the evidence presented regarding this ground.

With regard to this ground of abandonment, we have explained:

> Incarceration alone is not conclusive evidence of wanton conduct prior to incarceration. *In re Audrey S.*, 182 S.W.3d 838, 866 (Tenn. Ct. App. 2005). Rather, "incarceration serves only as a triggering mechanism that allows the court to take a closer look at the child's situation to determine whether the parental behavior that resulted in incarceration is part of a broader pattern of conduct that renders the parent unfit or poses a risk of substantial harm to the welfare of the child." *Id.* The statutory language governing abandonment due to a parent's wanton disregard for the welfare of a child "reflects the commonsense notion that parental incarceration is a strong indicator that there may be problems in the home that threaten the welfare

- 15 -

of the child" and recognizes that a "parent's decision to engage in conduct that carries with it the risk of incarceration is itself indicative that the parent may not be fit to care for the child." *Id.*

Numerous cases have held that a parent's previous criminal conduct, coupled with a history of drug abuse, constitutes a wanton disregard for the welfare of the child. *See, e.g.*, *State v. J.M.F.*, No. E2003-03081-COA-R3-PT, 2005 WL 94465, at *8 (Tenn. Ct. App. Jan. 11, 2005); *In re C. LaC.*, No. M2003-02164-COA-R3-PT, 2004 WL 533937, at *7 (Tenn. Ct. App. Mar. 17, 2004); *State v. Wiley*, No. 03A01-9903-JV-00091, 1999 WL 1068726, at *7 (Tenn. Ct. App. Nov. 24, 1999); *In the Matter of Shipley*, No. 03A01-9611-JV-00369, 1997 WL 596281, at *5 (Tenn. Ct. App. Sept. 29, 1997). "[P]robation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child." *In re Audrey S.*, 182 S.W.3d at 867–68.

*In re C.A.H.*, No. M2009-00769-COA-R3-PT, 2009 WL 5064953, at *5 (Tenn. Ct. App. Dec. 22, 2009).

In its final order, the trial court found that DCS proved by clear and convincing evidence the ground of abandonment by wanton disregard. Specifically, the trial court made the following findings:

12. . . . [P]rior to his incarceration for Violation of Probation, [Father] obtained several criminal convictions for the manufacture and promotion of methamphetamine. Further, [Father] lived a transient lifestyle and failed to report for his probation so that he could remain out of jail. He also abused illegal drugs, as evidenced by his positive drug test for opiates and cocaine. In regard to this dirty drug test, the [c]ourt finds that [Father] testified that his probation officer did not give him a chance to "get clean" prior to administrating said drug test to him. However, the [c]ourt also finds that [Father] was on notice that he would be drug screened as a condition of his probation.
13. The [c]ourt finds that all of the aforementioned behaviors indicate that [Father] has demonstrated a wanton disregard for the child's welfare and that this lack of concern for the child is the type of behavior that this ground for termination was designed to address.

It appears from the trial court's order that the trial court considered events that occurred even before the child's conception to support its finding of abandonment by wanton disregard. Father argues that the trial court erred in considering the convictions

- 16 -

and violation of probation that occurred even before the child was born. We agree. "Logically, a person cannot disregard or display indifference about someone whom he does not know exists." *In re Anthony R.*, No. M2014-01753-COA-R3-PT, 2015 WL 3611244, at *3 (Tenn. Ct. App. June 9, 2015). Pursuant to Tennessee Code Annotated section 36-1-102(13), a "child" is defined as "any person . . . under eighteen (18) years of age." Tennessee courts have expanded the definition of a "child" to include not only the period after the child's birth but also the period before birth but after the child's conception in the context of the ground of abandonment by wanton disregard for the welfare of the child. *See, e.g.*, *In re Jocilyn M.P.*, 435 S.W.3d 773, 782 (Tenn. Ct. App. 2014) (considering criminal charges against father "from the discovery of [mother's] pregnancy"); *In re O.J.B.*, No. W2009-00782-COA-R3-PT, 2009 WL 3570901, at *5 (Tenn. Ct. App. Nov. 2, 2009) (considering the fact that mother ingested drugs while she was pregnant with the child and pled guilty to additional criminal charges shortly after the child's birth); *State of Tenn., Dep't of Children's Servs. v. Harville*, No. E2008-00475-COA-R3-PT, 2009 WL 961782, at *8 (Tenn. Ct. App. Apr. 9, 2009) (finding that mother demonstrated a wanton disregard for the child's welfare by exposing the child to cocaine in utero). "[W]hile the statutory reference to 'the child' can mean a child in utero, the wanton disregard language of Tenn[essee] Code Ann[otated section] 36-1-102(1)(A)(iv) must be construed to require that the father has knowledge of the child at the time his actions constituting wanton disregard are taken." *In re Anthony R.*, 2015 WL 3611244, at *3.

In this case, the offense dates for the underlying drug offenses that ultimately led to Father's convictions—March 30, 2013; April 5, 2013; and May 4, 2013—occurred almost two years before the child's birth in February 2015, and Father was convicted in January 2014—over a year before the child was born. It is also undisputed that Father's first violation of probation wherein he failed his drug screen and absconded occurred a few days after February 28, 2014, even though the order was ultimately entered on May 27, 2015, three months after the child's birth. Although Father's act of absconding for over a year until May 2015 could, in a typical case, be considered in the determination of whether Father abandoned the child by wanton disregard, DCS has presented no proof showing that Father knew the child was conceived during the time that Father was absconding. Indeed, other than the acknowledgement in DCS's brief of the proof presented at trial that, "[a]t the latest, Father claimed paternity of the child during the period of the time Father was out of jail between May and July 2015," the record is silent with respect to when Father was first aware of Mother's pregnancy. As such, we agree with Father that these prior bad acts should not have been considered by the trial court when determining whether clear and convincing evidence existed to terminate his parental rights on the ground of abandonment by wanton disregard. *See In re A.E.T.*, No. M2015-01193-COA-R3-PT, 2016 WL 4056467, at *8 (Tenn. Ct. App. July 26, 2016) ("At the time [f]ather committed the acts that resulted in the convictions listed in paragraph (2)(e) of the trial court's order, the [c]hild did not exist and [f]ather did not know that the [c]hild would someday come to exist. Therefore, we will not rely on them

in our consideration of whether [f]ather abandoned the [c]hild by wanton disregard.”). Consequently, our review of the record indicates that the following bad conduct by Father occurred after the child's conception/birth: the violation of Father's probation based on his failure to report for intake to community corrections on June 3, 2015 and failure to keep in touch with his probation officer as required by the terms of his probation.

DCS cites *In re Chyna L.M.D.*, No. E2012-00661-COA-R3-PT, 2012 WL 3776699 (Tenn. Ct. App. Aug. 31, 2012), arguing that even a single instance of bad conduct can lead to a finding of abandonment by wanton disregard. In that case, the father was released on probation prior to the child's birth but subsequently violated his probation. *Id.* at *5. As an alternative to being sent back to prison, Father was given an offer of enhanced probation so that he could remain in the community and participate in the child's life. *Id.* However, father, with knowledge that the mother was pregnant with his child, behaved in such a way at the hearing to cause the offer of enhanced probation to be withdrawn. *Id.* As a result, father was sent to prison to serve the remainder of his eight-year sentence. *Id.* at *1, 5.

Father's conduct in this case is distinguishable from the father's conduct in *In re Chyna L.M.D.* Unlike the facts in *In re Chyna L.M.D.*, where no evidence of any redeeming factors was presented, the record in this case shows that Father visited with the child every day during the thirty-five days in 2015 when he was released on house arrest. During the same period of time when Father failed to report for intake, Father also provided for the child rather than ignored his parental duties. This is not a case where Father totally neglected his parental duties in order to further his criminal enterprises. *See, e.g.*, *In re K.F.R.T.*, 493 S.W.3d 55, 61 (Tenn. Ct. App. 2016), *perm. app. denied* (Tenn. June 6, 2016) (affirming the ground of wanton disregard because "the father . . . was arrested for theft, multiple D.U.I. offenses, repeated traffic offenses, domestic violence against the biological mother of the children central to this appeal, multiple illegal border crossings, and even extortion" resulting in "multiple incarcerations and/or deportations"); *In re Jocilyn M.P.*, 435 S.W.3d 773, 787 (Tenn. Ct. App. 2014) (affirming the ground of wanton disregard, which was evidenced by father's "criminal behavior, continued incarcerations, drug abuse, failing to meet the child's material needs, his disrespect for authority, conspiring in an armed robbery of another drug dealer/felon, while the child and her two half-siblings and the child's mother were in the home, and the demonstration of a general lack of concern towards this child"). Moreover, although Father's initial conviction was drug-related, there is no evidence that Father continued to abuse drugs after the child's birth. Even if the totality of Father's decisions ultimately prevented him from having a relationship with his child, his one poor decision, without more, does not rise to the level of "unrestrainedly excessive" disregard for the child. *See The American Heritage College Dictionary* 1544–45 (4th ed.) (defining "wanton" as "[u]nrestrainedly excessive"). Rather, Father by his conduct showed that he was willing to care for the child. Under these circumstances, we do not believe that the evidence of Father's one violation of probation based on failure to report establishes by clear and

convincing evidence that Father abandoned the child by displaying wanton disregard for the welfare of the child. *See In re Renaldo M.*, No. M2016-00472-COA-R3-PT, 2017 WL 1041541, at *5 (Tenn. Ct. App. Feb. 7, 2017), *app. denied* (Tenn. Feb. 7, 2017) (reversing the trial court's finding of abandonment by wanton disregard because "[t]he record shows that, despite the lapses in her behavior, [m]other has shown a great deal of care and concern for the children, and she has made a genuine effort to establish a meaningful relationship with them" such as "complet[ing] tasks on the permanency plan, spen[ding] $800.00 on parenting classes, and attend[ing] every visitation with the children that she was permitted"); *In re Dylan M. J.*, No. M2010-01867-COA-R3-PT, 2011 WL 941404, at *8 (Tenn. Ct. App. Mar. 17, 2011) (reversing the trial court's finding of wanton disregard because, "despite the regrettable lapses in [father's] behavior, [f]ather has shown a great deal of care and concern for his son, and he has made a genuine effort to establish a meaningful relationship with him"). As a result, we reverse the trial court's termination of Father's parental rights on the ground of abandonment by wanton disregard for the child's welfare.

## Best Interest of the Child

When at least one ground for termination of parental rights has been established, the petitioner must then prove by clear and convincing evidence that termination of the parent's rights is in the child's best interest. *White v. Moody*, 171 S.W.3d 187, 192 (Tenn. Ct. App. 1994). When a parent has been found to be unfit (upon establishment of ground(s) for termination of parental rights), the interests of parent and child diverge. *In re Audrey S.*, 182 S.W.3d at 877. The focus shifts to the child's best interest. *Id*. Because not all parental conduct is irredeemable, Tennessee's termination of parental rights statutes recognize the possibility that terminating an unfit parent's parental rights is not always in the child's best interest. *Id*. However, when the interests of the parent and the child conflict, courts are to resolve the conflict in favor of the rights and best interest of the child. Tenn. Code Ann. § 36-1-101(d). Further, "[t]he child's best interest must be viewed from the child's, rather than the parent's, perspective." *Moody*, 171 S.W.3d at 194.

The Tennessee Legislature has codified certain factors that courts should consider in ascertaining the best interest of the child in a termination of parental rights case. These factors include, but are not limited to, the following:

> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
> (2) Whether the parent or guardian has failed to affect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

- 19 -

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i). This Court has noted that, "this list [of factors] is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's rights is in the best interest of a child." *In re M. A. R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005).

Depending on the circumstances of an individual case, the consideration of a single factor or other facts outside the enumerated, statutory factors may dictate the outcome of the best interest analysis. *In re Audrey S.*, 182 S.W.3d at 877. As explained by this Court:

Ascertaining a child's best interests does not call for a rote examination of each of Tenn. Code Ann. § 36-1-113(i)'s nine factors and then a determination of whether the sum of the factors tips in favor of or against the parent. The relevancy and weight to be given each factor depends on the unique facts of each case. Thus, depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis.

*In re Audrey S.*, 182 S .W.3d at 878 (citing *White v. Moody*, 171 S.W.3d at 194).

Here, the trial court found that it was in the best interest of the child to terminate Father's parental rights. The trial court found that Father had not visited the child since July 2015, and, during the child's lifetime, Father only visited with the child during the thirty-five days when he was released from incarceration. *See* Tenn. Code Ann. § 36-1-113(i)(3). The trial court further found that, because of Father's lack of contact and involvement with the child, there is no meaningful relationship between Father and the child. *See* Tenn. Code Ann. § 36-1-113(i)(4).

The evidence does not preponderate against this finding, which weighs in favor of termination. Here, the record shows that, as of the date of the final hearing, Father was incarcerated, serving a nine year sentence with a release date of October 1, 2023. Father will not be eligible for parole until December 2018 at a minimum. Further, it appears that Father has little to no relationship with the child at all. Indeed, Father only visited with the child during the thirty-five days when he was released from incarceration in 2015. However, the visitation ended because of Father's own conduct of failing to report for intake while he was on house arrest, and, as a result, Father was re-incarcerated, ensuring that he would be out of the child's life for some time. As of the date of trial, the child was nineteen months old, and Father has been incarcerated for most of the child's life. In contrast, the record indicates that the child has done well in foster parents' care. The child, who has been with the same foster family for sixteen months, has established a bond with the foster parents and refers to the foster parents as mom and dad.

In addition, the trial court found that Father has not paid child support consistently, while foster parents have taken care of all of the child's needs. *See* Tenn. Code Ann. § 36-1-113(i)(9). This finding is likewise supported by the record and weighs in favor of termination. Our review of the record shows that, besides the gifts that Father purportedly brought to the child during the thirty-five days when he was released from incarceration, Father did not contribute any further support to the child due to his incarceration. On the other hand, foster parents have adequately provided for the child's needs without Father's help by taking the child on vacations and other special events with foster parents' extended family and making sure that the child's medical needs were met.

Not all factors, however, weigh clearly in favor of termination. First, contrary to the trial court's finding, there is some doubt that the child's mental, emotional, or medical condition would suffer harm if the child was required to maintain contact with Father. *See* Tenn. Code Ann. § 36-1-113(i)(5). The record shows that the child is doing exceptionally well in foster parents' care. The child's mental and emotional health certainly cannot be attributed to Father, who has been incarcerated for most of the child's life. Still, nothing in the record indicates that the child suffered any harm when Father visited with the child during the thirty-five day period when he was out of jail in 2015. Accordingly, this factor favors neither party in this case.

Besides Father's current incarceration, there is no evidence that Father failed to make "an adjustment of circumstance, conduct, or conditions as to make it safe" for the child to be in Father's care or "to affect a lasting adjustment after reasonable efforts by available social services agencies." *See* Tenn. Code Ann. § 36-1-113(i)(1), (2). Here, Father had been unable to complete any substance abuse treatment because he was still on the waiting list for the program, and there is no evidence that Father failed to take advantage of any opportunities offered to him. In addition, the record is devoid of any reasonable efforts by DCS to help Father legitimate the child. Indeed, DCS does not dispute that it failed to include "establish paternity" as a stated goal in the permanency plans. Accordingly, this factor also favors neither party in this case.

Moreover, there is no evidence that Father or anyone in his home has ever "shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child" or any other child. *See* Tenn. Code Ann. § 36-1-113(i)(6). Indeed, there is nothing in the record to suggest that the child was in any way abused or neglected in Father's care when he was visiting the child during the thirty-five days when he was released from incarceration. Rather, Father seemed to have accepted responsibility by visiting the child and bringing her gifts. Accordingly, this factor weighs against termination.

We do not doubt that Father loves the child at issue in this case. However, Father made the voluntary decision to not report for intake, knowing that his failure to do so could result in his re-incarceration and remove him from the child's life. In addition, the record indicates that Father may have two holds for his arrest in Florida and that he is currently incarcerated with a release date of October 1, 2023. The best interests of the child are therefore furthered by allowing the child to remain in the foster parents' care and to move on from the uncertainty that would result from her relationship with Father, who would not be eligible for parole until the child is almost four years old. From the totality of the circumstances, we conclude that clear and convincing evidence supports the trial court's conclusion that termination of Father's parental rights is in the child's best interest.

## CONCLUSION

The judgment of the Washington County Juvenile Court is reversed in part and affirmed in part. We reverse the following grounds found by the trial court: (1) that placing the child in Father's legal and physical custody would pose a risk of substantial harm to the child's physical and psychological welfare; and (2) abandonment by wanton disregard for the welfare of the child. The grounds of failure to manifest an ability and willingness to assume legal and physical custody of the child and failure to establish or exercise paternity are affirmed. The determination that termination is in the child's best interest is affirmed. This cause is remanded to the trial court for further proceedings as may be necessary and are consistent with this Opinion. Costs of this appeal are taxed

one-half to the Appellant, Michael B., and one-half to the Appellee, Department of Children's Services, for which execution may issue if necessary.


                                                 _____

                                                J. STEVEN STAFFORD, JUDGE