FILED
01/26/2018
Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs December 4, 2017

**IN RE MICHAEL O.**

**Appeal from the Juvenile Court for Tipton County**
**No. 16-JV-256      William A. Peeler, Judge**

_____

**No. W2017-01412-COA-R3-PT**
_____

The trial court terminated Father's parental rights on the ground of abandonment by demonstrating a wanton disregard for his child's welfare. DCS failed to offer evidence that Father knew of the child's existence when Father was engaging in the behavior that demonstrated wanton disregard. Accordingly, we reverse the termination of Father's parental rights.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Reversed and Remanded**

J. STEVEN STAFFORD, P.J.,W.S., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and ANDY D. BENNETT, J., joined.

Frank Deslaurier, Covington, Tennessee, for the appellant, Anthony O.

Herbert H. Slatery, III, Attorney General and Reporter; Jordan K. Crews, Assistant Attorney General, for the appellee, State of Tennessee, Department of Children's Services.

Michael H. Willis, Covington, Tennessee, Guardian ad Litem.

**OPINION**

FACTS

Anthony O. ("Father") is the natural and legal parent of the minor child.[1] At the time of the termination hearing the child was less than one year old. Children's mother, Chelsea S. ("Mother"), surrendered her parental rights to the children before the trial

---

[1] In cases originating from juvenile court, it is the policy of this Court to remove the names of minor children and other parties in order to protect their identities.

- 1 -

court on November 11, 2016. Therefore, this case arises solely from Father's appeal of the termination of his parental rights.

The minor child was born in early June 2016, and placed in the custody of the Tennessee Department of Children's Services ("DCS") on June 17, 2016.[2] At this time, DCS was already working with Mother and Father regarding their three older children, who had been in DCS custody since August 27, 2015. The three older children were removed from Mother and Father's home due to drug use, drug paraphernalia found in the home, and environmental neglect. *See In re Aaralyn O, et al.*, No. W2017-01411-COA-R3-PT, 2018 WL 468246 (Tenn. Ct. App. Jan. 18, 2018).

When the minor child was born, Father was incarcerated. Mother had been evicted from her home prior to the child's birth; however, Mother was able to stay with a family friend after the child was born, but this was not a permanent arrangement. Thus, Mother lacked stable housing. Mother was also prescribed methadone throughout her pregnancy, and she attended a methadone clinic. After the child was born, meconium test results confirmed that the child was positive for methadone. This led to the child experiencing severe withdrawal symptoms during his first few months of life.

On June 14, 2016, Mother took the child to a doctor's appointment. The child's pediatrician later reported that Mother seemed to be under the influence during the appointment. The pediatrician stated that during the appointment Mother kept falling asleep and was inattentive to the child. It was also reported that Mother placed the child in the front seat of her vehicle when she left the doctor's appointment.

Two days later, on June 16, 2016, Mother reportedly rear-ended another vehicle while the child was in Mother's vehicle. Although the child was not injured, Mother was given a ticket for driving without a license and having no insurance.[3] Mother then contacted DCS social worker Bridget Norfork ("Ms. Norfork") for assistance with the child. Upon meeting, Ms. Norfork observed that the child was hungry. Mother informed Ms. Norfork that she had only a small amount of formula for him at that time; however, she had an appointment at WIC[4] the following Monday and would obtain more formula then.

---

[2] From the record it appears that following the child's birth he was hospitalized for a time due to withdrawal symptoms, but later released from the hospital into Mother's care.

[3] Mother was on probation when the accident occurred, but the record is unclear as to the effect, if any, of this collision on Mother's probation.

[4] WIC is "The Special Supplemental Nutrition Program for Women, Infants, and Children (WIC) [that] provides Federal grants to States for supplemental foods, health care referrals, and nutrition education for low-income pregnant, breastfeeding, and non-breastfeeding postpartum women, and to infants and children up to age five who are found to be at nutritional risk." *Women, Infants, and Children (WIC)*, U.S. DEP'T OF AGRIC. FOOD AND NUTRITION SERV. (last published Aug. 15, 2017), https://www.fns.usda.gov/wic/women-infants-and-children-wic.

The child was placed in DCS's custody on June 17, 2016, based upon DCS's determination that Mother and Father made little to no progress in remedying the conditions that led to the removal of their oldest three children and were non-compliant with DCS's recommendations. Thus, Mother's and Father's actions, or inactions, rendered it unsafe for the child to remain in his parents' care. The child has remained in DCS's custody since June 17, 2016, and Father has never met the child.

On November 17, 2016, DCS filed a petition to terminate Father's parental rights on the ground of abandonment by an incarcerated parent by exhibiting a wanton disregard for the child. At the hearing, the trial court heard testimony from Father, Ms. Norfork, Michelle S. ("Foster Mother"), and Zach S. ("Foster Father"). During his testimony, Father acknowledged his lengthy criminal history: Father admitted that in 2009, he was convicted of Grand Theft Auto in Florida, where he served twenty-two months for the crime. Further, Father testified that he was charged with, and pled guilty to, the intentional sale of a controlled substance in 2012. Father also admitted that he had violated probation at least four or five times in total.

Additionally, Father affirmed that he was charged with vandalism in September 2015. As a result, Father was found to have violated his probation and, in March 2016, was sentenced to five years incarceration to be served at thirty percent. Father testified, however, that with good time credits, his expected release date is January 2018.[5] Because the child was born following Father's current incarceration, Father acknowledged that he has never met this child.

Father also conceded that he did have a history of drug use and that he had continued to use drugs intermittently until he was incarcerated in March 2016. However, he also stated that he had been drug free for approximately fifteen months, essentially the entire time he had been incarcerated.

Lastly, Father testified that at the time of the termination hearing, he had a job pursuant to a prison work release program packing boxes at a warehouse. He asserted that he was paid about $7.25 an hour and earned approximately $190 per week after paying room and board. Father had, additionally, saved approximately $2,000 at the time of trial. However, he also admitted that even though he had savings and a steady job, he had never paid any support to the child at issue.

Ms. Norfork also testified at the May 11 hearing. She asserted that the child was placed in a pre-adoptive foster home, and his foster family was the only family he had ever known. Ms. Norfork stated that she had observed the child to be bonded with the foster family, and in her opinion it would be detrimental to remove the child from his

---

[5] Although the record is not clear that Father's release on this date is guaranteed, this release date generally was not disputed by DCS.

current placement. Foster Mother and Foster Father similarly testified that the child's only meaningful parental relationship is with them, that the child has flourished in their care, and that it would be devastating for the child should he be removed from the only family he has ever known.

Ultimately, the trial court found each witness credible, including Father as he "d[id] not deny the facts of the Petition, merely the legal conclusions." The trial court also found that based on the evidence presented, there was clear and convincing evidence that Father abandoned the minor child pursuant to Tennessee Code Annotated sections 36-1-113(g)(1) based on behavior that demonstrated a wanton disregard for the welfare of the child and it was in the child's best interest that Father's parental rights be terminated.

Therefore, the trial court issued a written order on May 16, 2017, terminating Father's parental rights and awarding full guardianship to DCS. From this order, Father appeals.

ISSUE PRESENTED

In his brief, Father raises three issues, arguing that the trial court erred in finding clear and convincing evidence that Father had substantially failed to comply with the permanency plans and that the conditions that led to the child's removal still persist. Father also argued that the trial court erred in finding that termination of Father's parental rights was in the child's best interest.

As DCS points out in its brief, however, DCS did not pursue nor did the trial court find the grounds of substantial noncompliance and persistence of conditions. Rather the only ground at issue in this case is whether DCS proved by clear and convincing evidence that Father abandoned the child by demonstrating a wanton disregard for the welfare of the child.[6] Accordingly, we will proceed in only analyzing the single ground in which the trial court terminated parental rights--abandonment by wanton disregard. *See In re Carrington H.*, 483 S.W.3d 507, 525−26 (Tenn. 2016) ("[W]e hold that in an appeal from an order terminating parental rights the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal."). Based upon our review of the record, we conclude that DCS failed to present clear and convincing evidence on this ground and therefore do not proceed to consider the best interest of the child.

---

[6] The grounds argued in Father's brief relate not to the child at issue but to the grounds that were alleged against Father as to this child's three older siblings. *See In re Aaralyn O.,* 2018 WL 468246, at *5−12 (affirming the trial court's decision in terminating Father's rights on the grounds of failure to provide a suitable home, abandonment by wanton disregard, substantial noncompliance with the permanency plans, and persistent conditions).

- 4 -

STANDARD OF REVIEW

As explained by the Tennessee Supreme Court:

A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions. *Troxel v. Granville*, 530 U.S. 57, 65 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female child*, 896 S.W.2d 546, 547–48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578–79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as parens patriae has a special duty to protect minors . . . .' Tennessee law, thus, upholds the [S]tate's authority as parens patriae when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745, 747 (1982); *In re Angela E.*, 303 S.W.3d at 250.

*In re Carrington H.*, 483 S.W.3d 507, 522–23 (Tenn. 2016) (footnote omitted).

Our termination statutes identify "those situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought." *In re Jacobe M.J.*, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013) (quoting *In re W.B.*, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005)). A person seeking to terminate parental rights must prove both the existence of one of the statutory grounds for termination and that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c); *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

Because of the fundamental nature of the parent's rights and the grave consequences of the termination of those rights, courts must require a higher standard of proof in deciding termination cases. *Santosky*, 455 U.S. at 769. Consequently, both the grounds for termination and the best interest inquiry must be established by clear and convincing evidence. Tenn. Code Ann. § 36-3-113(c)(1); *In re Valentine*, 79 S.W.3d at 546. Evidence that is clear and convincing "establishes that the truth of the facts asserted is highly probable . . . and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re Navada N.*, 498 S.W.3d 579, 590 (Tenn. Ct. App. 2016) (citing *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004)). As opined by the Tennessee Supreme Court:

The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. *In re M.L.P.*, 281 S.W.3d [387,] 393 [(Tenn. Ct. App. 2009)] (quoting *In re Adoption of A.M.H.*, 215 S.W.3d [793], 810 [(Tenn. 2007)]). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d at 246.

*In re Carrington H.*, 2016 WL 819593, at *12. However, "[w]hen the resolution of an issue in a case depends upon the truthfulness of witnesses, the trial judge, who has had the opportunity to observe the witnesses and their manner and demeanor while testifying, is in a far better position than this Court to decide those issues." *In re Navada N.*, 498 S.W.3d at 591 (citing *McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn. 1995); *Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997)). Therefore, "this Court gives great weight to the credibility accorded to a particular witness by the trial court." *In re Christopher J.*, No. W2016-02149-COA-R3-PT, 2017 WL 5992359, at *3 (Tenn. Ct. App. Dec. 4, 2017) (citing *Whitaker*, 957 S.W.2d at 837).

DISCUSSION

In this case, the trial court found one ground for termination: Father abandoned the child by demonstrating a wanton disregard for his welfare pursuant to Tennessee Code Annotated section 36-1-113(g)(1). According to Tennessee Code Annotated section 36-1-102(1)(A)(iv), abandonment has occurred, *inter alia,* when a

> parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding . . . [and] has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child.

Tenn. Code Ann. § 36-1-102(1)(A)(iv). However, "incarceration alone [is not] a ground from the termination of parental rights. An incarcerated or recently incarcerated parent can be found [to have committed] abandonment only if the court finds, by clear and convincing evidence, that the parent's pre-incarceration conduct displayed a wanton disregard for the welfare of the child." *In re Audrey S.*, 182 S.W.3d 838, 866 (Tenn. Ct. App. 2005). The statutory language balances the notion that "incarceration is a strong indicator that there may be problems in the home that threaten the welfare of the child[,]" yet, "incarceration alone in not an infallible predictor of parental unfitness." *Id.* Therefore, a parent's incarceration acts as a "triggering mechanism" that allows the court to examine more closely the child's situation "to determine whether the parental behavior that resulted in incarceration is part of a broader pattern of conduct that renders the parent

- 6 -

unfit or poses a risk of substantial harm to the welfare of the child." *Id.* As such, many cases have held that a "parent's previous criminal conduct, coupled with a history of drug abuse, constitutes a wanton disregard for the welfare of the child." *In re Navada N.*, 498 S.W.3d at 602; *see, e.g., State v. J.M.F.*, No. E2003-03081-COA-R3-PT, 2005 WL 94465, at *8 (Tenn. Ct. App. Jan. 11, 2005); *In re C. LaC.*, No. M2003-02164-COA-R3-PT, 2004 WL 533937, at *7 (Tenn. Ct. App. Mar. 17, 2004); *State v. Wiley*, No. 03A01-9903-JV-00091, 1999 WL 1068726, at *7 (Tenn. Ct. App. Nov. 24, 1999); *In the Matter of Shipley*, No. 03A01-9611-JV-00369, 1997 WL 596281, at *5 (Tenn. Ct. App. Sept. 29, 1997). Further, "probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child" can constitute conduct demonstrating a wanton disregard for the child. *In re Audrey S.*, 182 S.W.3d at 867–68. Additionally, the court may consider a parent's behavior prior to the four months immediately preceding incarceration in finding behavior that exhibited wanton disregard for the child. *See id.* at 871.

As a preliminary matter, it is undisputed that Father was incarcerated beginning in March 2016, and was still incarcerated at the time DCS filed its termination petition in December 2016. Thus, this ground is clearly applicable. *See* Tenn. Code Ann. § 36-1-102(1)(A)(iv) (applying when the parent is incarcerated at or near the filing of the termination petition). Accordingly, we will proceed in analyzing the evidence presented regarding this ground.

Turning to the trial court's order, the trial court made the following findings with regard to this ground:

> c. . . . Mother and Father were together while the child was conceived.
>
> d. That the Father has a history of violations of probation, criminal behavior, and habitual drug use, and despite numerous opportunities to correct behavior, has continued to drag children from 'pillar to post', with no change in behavior. That the Father acknowledges his criminal conduct, including Grand Theft Auto [in 2009], Manufacture/delivery/sell controlled substance [in 2012], driving on a revoked/suspended/cancelled license [in 2013], and numerous Violations of Probation.
>
> e. That the Father's continued criminal behavior, even after the removal of the children, demonstrates a wanton disregard or the welfare of the children.

Respectfully, we do not agree that these facts support a conclusion that Father exhibited a wanton disregard for the child at issue.

In order for a parent to disregard or show indifference to a child, the parent must know of the child's existence.  *See* ***In re Anthony R.,*** No. M2014-01753-COA-R3-PT, 2015 WL 3611244, at \*3 (Tenn. Ct. App. June 9, 2015) ("Logically, a person cannot disregard or display indifference about someone whom he does not know exists."); *see also* ***In re Jeremiah T.***, No. E2008-02099-COA-R3-PT, 2009 WL 1162860, at \*1 (Tenn. Ct. App. Apr. 30, 2009) (noting that the parent's poor conduct need not occur only in the four months preceding the filing of the termination petition, but relying on criminal conduct that occurred after the births of the children); ***In re Audrey S.***, 182 S.W.3d at 871 (holding that the trial court may consider poor conduct that occurred prior to the four months preceding the filing of the termination petition, but citing only criminal conduct that occurred following the birth of the child).   In Tennessee, any person under the age of eighteen is considered a child.  *See* Tenn. Code Ann. § 36-1-102(13).   However, this Court has often extended the meaning of child to include not only the time after birth but also the period of time before birth but after conception when analyzing the ground of abandonment by wanton disregard for the welfare of the child.  *See, e.g.*, ***In re E.C.***, No. E2016-02582-COA-R3-PT, 2017 WL 2438574, at \*12 (Tenn. Ct. App. June 6, 2017) (holding that it was inappropriate to consider the parent's poor conduct prior to his knowledge of the child's existence); ***In re Jocilyn M.P.***, 435 S.W.3d 773, 782 (Tenn. Ct. App. 2014) (considering criminal charges against father "from the discovery of [mother's] pregnancy"); ***In re O.J.B.***, No. W2009-00782-COA-R3-PT, 2009 WL 3570901, at \*5 (Tenn. Ct. App. Nov. 2, 2009) (considering the fact that mother ingested drugs while she was pregnant with the child and pled guilty to additional criminal charges shortly after the child's birth); ***State of Tenn., Dep't of Children's Servs. v. Harville***, No. E2008-00475-COA-R3-PT, 2009 WL 961782, at \*8 (Tenn. Ct. App. Apr. 9, 2009) (finding that mother demonstrated a wanton disregard for the child's welfare by exposing the child to cocaine in utero). Thus, even though the statutory meaning of the word "child" encompasses the time at which the child was conceived up until its eighteenth birthday, we must construe Tennessee Code Annotated section 36-1-102(1)(A)(iv) "to require that the father has knowledge of the child at the time his actions constituting wanton disregard are taken."  ***In re E.C.***, 2017 WL 2438574, at \*12 (quoting ***In re Anthony R.***, 2015 WL 3611244, at \*3).

After a review of the record, it appears to this Court that the trial court failed to consider Father's knowledge of the child's existence in its findings on this factor. Here, none of Father's criminal conduct occurred after the birth of the child. The child was born in early June 2016.  Clearly, then, the trial court's reliance on Father's criminal conduct in 2009, 2012, and 2013, years before the child at issue's birth, was in error.  *See* ***In re E.C.***, 2017 WL 2438574, at \*12 (Tenn. Ct. App. June 6, 2017) (holding that father's criminal activity that occurred prior to the father's knowledge of the conception of the child was insufficient to support this ground).[7]

---

[7] DCS does not cite any authority to suggest that criminal conduct that occurs during an older

Less clear, however, is whether the trial court erred in considering Father's September 2015 vandalism charge, which ultimately led to Father's incarceration in March 2016, in making its wanton disregard determination.[8]  Although the trial court found that Mother and Father were "together" when the child was conceived, the trial court made no finding as to whether Father was aware of Mother's pregnancy at the time he committed this crime. *See In re Anthony R.*, 2015 WL 3611244, at *3 (requiring that the father know of the child's existence).  The trial court's lack of finding on this issue is unsurprising, as after a thorough review of the record, we can find no evidence that meets the clear and convincing standard to show that Father had knowledge of the existence of the child prior to his birth.

We note that the burden of proof in a parental termination case falls on the party seeking to terminate parental rights.  Thus, the burden falls on DCS, not Father, to prove Father's wanton disregard of the child by clear and convincing evidence  Tenn. Code Ann. § 36-1-113(c)(1); *In re Audrey S.*, 182 S.W.3d at 861 ("Because the stakes are so profoundly high, Tenn. Code Ann. § 36-1-113(c)(1) requires persons seeking to terminate a biological parent's parental rights to prove the statutory grounds for termination by clear and convincing evidence.").  After a thorough review of the record, we conclude that DCS failed to provide any evidence that Father knew of the child's conception at the time he committed the criminal act that DCS now contends constituted a wanton disregard for the child's welfare.  DCS did offer evidence that (1) Father was the biological father of this child; (2) Father's name was listed on the birth certificate; (3) Mother and Father lived together at some points from September 2015 to March 2016; and (4) Mother and Father were married prior to September 2015 and were still married at the time of trial.  Thus, while there is no dispute that Father is the biological and legal parent of the child, this evidence fails to establish at what point Father knew or even suspected that Mother was pregnant with the child at issue. DCS alleges, however, that the child was likely conceived around September 2015, the same time that Father committed the vandalism that led to the violation of his probation. Even assuming that the child was conceived in September 2015, however, this evidence alone does not establish by clear and convincing evidence that Father knew of the child's existence at

sibling's life should automatically be applied in the case of an after-born child. Indeed, nothing in section 36-1-102(1)(A)(iv) indicates that this ground should apply regardless of whether the wanton disregard was exhibited toward the child, his or her siblings, or other children in the home, unlike the ground of severe abuse. *See generally* Tenn. Code Ann. § 36-1-102(1)(A)(iv) (requiring that the parent's conduct show a wanton disregard for "the child" without reference to siblings); *but see* Tenn. Code Ann. § 36-1-113(g)(4) (applying the severe abuse ground where the parent has committed severe abuse "against the child who is the subject of the petition or against any sibling or half-sibling of such child, or any other child residing temporarily or permanently in the home of such parent or guardian"). As such, we consider only conduct that exhibited a wanton disregard to the child at issue in this case.

[8] It seems that Father was arrested again in November, 2015, and incarcerated for a short time following this arrest; however, we have found no evidence that Father was ever convicted as a result of the November 2015 arrest.

this early date.

We note, however, that the record does suggest that Mother was aware of her pregnancy prior to the birth because an order in the dependency and neglect proceeding states that Mother had been ordered to attend a methadone clinic during the pregnancy and advised that the child could test positive for methadone once born. Nothing in the record, however, indicates the timeline for Mother's own discovery of her pregnancy and subsequent treatment at the methadone clinic. Because Father testified without dispute that he and Mother were not in a relationship throughout the proceedings at issue,[9] we cannot conclude that Mother's knowledge of the child's existence at some unspecified point in her pregnancy should be imputed to Father, especially at the early date of September 2015. Instead, Father was simply never asked at trial the date upon which he or Mother discovered the pregnancy. Respectfully, given the stringent standard applicable in termination of parental rights cases, we cannot merely assume Father's knowledge in the absence of proper evidence. Thus, the trial court erred in relying on any of Father's admitted criminal conduct in this case because DCS failed to prove that any of this conduct occurred at a time when Father was aware of the existence of the child.

As noted above, however, criminal conduct is not the only type of conduct that can constitute a wanton disregard for the child. *See In re Audrey S.*, 182 S.W.3d at 867–68. We therefore proceed to consider if DCS met its burden to show any other conduct on the part of Father that exhibits a wanton disregard for the child. While it was undisputed by Father that he continued to abuse drugs until his incarceration in March 2016, Father's abuse of drugs suffers the same malady that befell the evidence of his criminal conduct: there is no evidence in the record to show that Father knew of the child's existence at the time he was using illegal drugs. Rather, the only evidence concerning Father's drug use following the birth of the child was that Father had not used illegal drugs following his incarceration in March 2016. While refraining from drug use in jail is often insufficient to show that a parent's drug use has been remedied, *see In re Navada N.*, 498 S.W.3d 579, 606 (Tenn. Ct. App. 2016) (noting that a parent's cessation of drug use while incarcerated is not sufficient to show that parent had resolved their drug problem), it is relevant in this case to the extent that it illustrates the lack of evidence that Father's drug use occurred following the birth of the child at issue. Again, while it is possible that Father knew of the child's existence prior to his current incarceration, as Mother appears to have known at some point prior to the child's birth, assumptions and surmises regarding Father's knowledge do not meet the clear and convincing standard necessary to justify the permanent termination of his parental rights on this ground. Thus, with no evidence or testimony regarding Father's knowledge of the existence of the child while he was using illegal drugs, we conclude that the trial court also erred in considering Father's illegal

---

[9] For example, Father testified that he and Mother lived together until September 2015 and other evidence suggests that they were together as late as November 2015. Still, the evidence does not clearly and convincingly show that Mother herself discovered her pregnancy prior to November 2015.

drug use up until March 2016 in its wanton disregard determination.

Finally, DCS argues that the wanton disregard ground has been shown by proof that Father failed to support the child despite his ability to do so. As previously discussed, "the failure to provide adequate support . . . for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child." *In re Audrey S.*, 182 S.W.3d at 867–68. As an initial matter, we note that the trial court made no specific findings regarding Father's failure to provide adequate support for the child. Nevertheless, the evidence at trial was undisputed that Father paid no support for the child despite the fact that he was working in prison and had saved a considerable sum of money, approximately $2,000.00. While we have previously held that "a single instance of bad conduct can lead to a finding of abandonment by wanton disregard," *In re E.C.*, 2017 WL 2438574, at *13, we have also noted that certain "redeeming factors" may be considered to show that the single instance of bad conduct does not rise to the level of wanton disregard. *Id.* (noting that evidence of "redeeming factors" in the record shows that the father was willing to take care of the child). For example, this Court has previously held that a parent's decision to engage in a single instance of non-violent criminal conduct that resulted in a jail sentence was insufficient to show wanton disregard where the parent had made a considerable effort to parent the child while not incarcerated. *Id.*

Redeeming factors in this case likewise militate against the conclusion that Father's failure to support, alone, is sufficient to show a wanton disregard for the child. As an initial matter, Father testified at trial that he had asked the DCS caseworker about where to send support, but that his offer was discouraged. The trial court in this case expressly found that Father was a credible witness and we will not overturn the trial court's findings that rest on credibility absent clear and convincing evidence to the contrary. *See Wells v. Tennessee Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999) ("[A]ppellate courts will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary.") (citing *Humphrey v. David Witherspoon, Inc.,* 734 S.W.2d 315, 315–16 (Tenn. 1987); *Bingham v. Dyersburg Fabrics Co., Inc.,* 567 S.W.2d 169, 170 (Tenn. 1978)).[10] Moreover, the evidence in the record was undisputed that Father completed anger management, relapse prevention, and parenting courses while incarcerated. While these actions proved "too little too late" with regard to Father's three older children who had been in DCS custody for some time, the completion of these courses occurred within the six months following the child at issue's birth. *See In re Aaralyn O.*, 2018 WL 468246, at *10. Thus, Father's conduct following

---

[10] The DCS caseworker's testimony was not clear as to whether DCS specifically requested support from Father. Nevertheless, it is well-settled that parents have a duty to support their children regardless of whether support has been ordered by the court. *See In re Makenzie L.*, No. M2014-01081-COA-R3-PT, 2015 WL 3793788, at *20 (Tenn. Ct. App. June 17, 2015), *perm. app. denied*, (Tenn. Oct. 15, 2015).

the birth of the child, considered *in toto*, does not rise to the level of "unrestrainedly excessive" disregard for the child. *See The American Heritage College Dictionary* 1544–45 (4th ed.) (defining "wanton" as "[u]nrestrainedly excessive"). Consequently, even though Father is ultimately unable to parent this child at this time due to his incarceration, the evidence presented at trial was insufficient to show that Father continued to engage in conduct following the birth of the child that amounted to a wanton disregard for the child's welfare.

In sum, DCS failed to prove that Father engaged in any criminal conduct or illegal drug use after he became aware of the existence of the child. While it was undisputed Father failed to provide support for the child despite his ability to do so, this fact, alone, does not reach the elevated standard of clear and convincing evidence and thus, is insufficient to support a finding of wanton disregard given other facts in the record. *See In re Navada N.*, 498 S.W.3d at 590 (noting that in parental termination cases the standard of proof is elevated to clear and convincing, which courts generally define as "evidence [that] establishes that the truth of the facts asserted is highly probable . . . and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence."). As such, the trial court erred in terminating Father's parental rights on the ground of abandonment by wanton disregard.

We acknowledge the disparate result in this case in relation to the child's older siblings, where we determined that the evidence clearly supported a determination that terminating the parental relationship with Father would serve their best interests, due in large part to the fact that Father has no meaningful relationship with the older children due to his current incarceration. *See In re Aaralyn*, 2018 WL 468246, at *13–14. Likewise, in this case, Father's decision to engage in criminal conduct prior to the child's birth means that he not only has no meaningful relationship with this child, but no relationship with him whatsoever. In this case, however, we do not reach the issue of whether termination is in the child's best interest because the proof presented by DCS was insufficient to substantiate the single ground for termination alleged. *See White v. Moody*, 171 S.W.3d 187, 192 (Tenn. Ct. App. 1994) (noting that the court considers best interest once a ground for termination has been proven).

CONCLUSION

The judgment of the Tipton County Juvenile Court is reversed, and this cause is remanded for further proceedings consistent with this Opinion. The costs of this appeal are taxed to the Department of Children's Services for which execution may issue if necessary.

_____
J. STEVEN STAFFORD, JUDGE